**DEFENDERS OF WILDLIFE and The Sierra Club, Petitioners,**

v.

**Carol M. BROWNER, in her official capacity as Administrator of the United States Environmental Protection Agency, Respondent.**

City of Tempe, Arizona; City of Tucson, Arizona; City of Mesa, Arizona; Pima County, Arizona; and City of Phoenix, Arizona, Intervenors–Respondents.

No. 98–71080.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 1999.

Decided Sept. 15, 1999.

Jennifer Anderson and David Baron, Arizona Center for Law in the Public Interest, Phoenix, Arizona, for the petitioners.

Alan Greenberg, Attorney, U.S. Department of Justice, Environment & Natural Resources Division, Denver, Colorado, for the respondent.

Craig Reece, Phoenix City Attorney's Office, Phoenix, Arizona; Stephen J. Burg, Mesa City Attorney's Office, Mesa, Arizona; Timothy Harrison, Tucson City Attorney's Office, Tucson, Arizona; Harlan C. Agnew, Deputy County Attorney, Tucson, Arizona; and Charlotte Benson, Tempe City Attorney's Office, Tempe, Arizona, for the intervenors-respondents.

David Burchmore, Squire, Sanders & Dempsey, Cleveland, Ohio, for amici curiae.

Before: NOONAN, THOMPSON, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

Petitioners challenge the Environmental Protection Agency's (EPA) decision to issue National Pollution Discharge Elimination System (NPDES) permits to five municipalities, for their separate storm sewers, without requiring numeric limitations to ensure compliance with state water-quality standards. Petitioners sought administrative review of the decision within the EPA, which the Environmental Appeals Board (EAB) denied. This timely petition for review ensued. For the reasons that follow, we deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Title 26 U.S.C. § 1342(a)(1) authorizes the EPA to issue NPDES permits, thereby allowing entities to discharge some pollutants. In 1992 and 1993, the cities of Tempe, Tucson, Mesa, and Phoenix, Arizona, and Pima County, Arizona (Intervenors), submitted applications for NPDES permits. The EPA prepared draft permits for public comment; those draft permits did not attempt to ensure compliance with Arizona's water-quality standards.

Petitioner Defenders of Wildlife objected to the permits, arguing that they must contain numeric limitations to ensure strict compliance with state water-quality standards. The State of Arizona also objected.

Thereafter, the EPA added new requirements:

> To ensure that the permittee's activities achieve timely compliance with applicable water quality standards (Arizona Administrative Code, Title 18, Chapter 11, Article 1), the permittee shall implement the [Storm Water Man-

agement Program], monitoring, reporting and other requirements of this permit in accordance with the time frames established in the [Storm Water Management Program] referenced in Part I.A.2, and elsewhere in the permit. This timely implementation of the requirements of this permit shall constitute a schedule of compliance authorized by Arizona Administrative Code, section R18–11–121(C).

The Storm Water Management Program included a number of structural environmental controls, such as storm-water detention basins, retention basins, and infiltration ponds. It also included programs to remove illegal discharges.

With the inclusion of those "best management practices," the EPA determined that the permits ensured compliance with state water-quality standards. The Arizona Department of Environmental Quality agreed:

> The Department has reviewed the referenced municipal NPDES storm-water permit pursuant to Section 401 of the Federal Clean Water Act to ensure compliance with State water quality standards. We have determined that, based on the information provided in the permit, and the fact sheet, adherence to provisions and requirements set forth in the final municipal permit, will protect the water quality of the receiving water.

On February 14, 1997, the EPA issued final NPDES permits to Intervenors. Within 30 days of that decision, Petitioners requested an evidentiary hearing with the regional administrator. See 40 C.F.R. § 124.74. Although Petitioners requested a hearing, they conceded that they raised only a legal issue and that a hearing was, in fact, unnecessary. Specifically, Petitioners raised only the legal question whether the Clean Water Act (CWA) requires numeric limitations to ensure strict compliance with state water-quality standards; they did not raise the factual question whether the management practices that the EPA chose would be effective.

On June 16, 1997, the regional administrator summarily denied Petitioners' request. Petitioners then filed a petition for review with the EAB. *See* 40 C.F.R. § 124.91(a). On May 21, 1998, the EAB denied the petition, holding that the permits need not contain numeric limitations to ensure strict compliance with state water-quality standards. Petitioners then moved for reconsideration, *see* 40 C.F.R. § 124.91(i), which the EAB denied.

## JURISDICTION

Title 33 U.S.C. § 1369(b)(1)(F) authorizes "any interested person" to seek review in this court of an EPA decision "issuing or denying any permit under section 1342 of this title." "Any interested person" means any person that satisfies the injury-in-fact requirement for Article III standing. *See Natural Resources Defense Council, Inc. v. EPA,* 966 F.2d 1292, 1297 (9th Cir.1992) [*NRDC II* ]. It is undisputed that Petitioners satisfy that requirement. Petitioners allege that "[m]embers of Defenders and the Club use and enjoy ecosystems affected by storm water discharges and sources thereof governed by the above-referenced permits," and no other party disputes those facts. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 565–66, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[A] plaintiff claiming injury from environmental damage must use the area affected by the challenged activity."); *see also NRDC II,* 966 F.2d at 1297 ("NRDC claims, inter alia, that [the] EPA has delayed unlawfully promulgation of storm water regulations and that its regulations, as published, inadequately control storm water contaminants. NRDC's allegations . . . satisfy the broad standing requirement applicable here.").

Intervenors argue, however, that they were not parties when this action was filed and that this court cannot redress Petitioners' injury without them. Their real contention appears to be that they are indispensable parties under Federal Rule of Civil Procedure 19. We need not consider that contention, however, because in fact Intervenors have been permitted to intervene in this action and to present their position fully. In the circumstances, Intervenors have suffered no injury.

## DISCUSSION

### A. *Standard of Review*

The Administrative Procedures Act (APA), 5 U.S.C. §§ 701–06, provides our standard of review for the EPA's decision to issue a permit. *See American Mining Congress v. EPA,* 965 F.2d 759, 763 (9th Cir.1992). Under the APA, we generally review such a decision to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

On questions of statutory interpretation, we follow the approach from *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See NRDC II,* 966 F.2d at 1297 (so holding). In *Chevron,* 467 U.S. at 842–44, 104 S.Ct. 2778, the Supreme Court devised a two-step process for reviewing an administrative agency's interpretation of a statute that it administers. *See also Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1452 (9th Cir.1996) ("The Supreme Court has established a two-step process for reviewing an agency's construction of a statute it administers."). Under the first step, we employ "traditional tools of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question before the court. *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778 (footnote omitted). If, instead, Congress has left a gap for the administrative agency to fill, we proceed to step two. *See id.* at 843, 104 S.Ct. 2778. At step two, we must uphold the administrative regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

## B. *Background*

The CWA generally prohibits the "discharge of any pollutant," 33 U.S.C. § 1311(a), from a "point source" into the navigable waters of the United States. *See* 33 U.S.C. § 1362(12)(A). An entity can, however, obtain an NPDES permit that allows for the discharge of some pollutants. *See* 33 U.S.C. § 1342(a)(1).

Ordinarily, an NPDES permit imposes effluent limitations on such discharges. *See* 33 U.S.C. § 1342(a)(1) (incorporating effluent limitations found in 33 U.S.C. § 1311). First, a permit-holder "shall ... achiev[e] ... effluent limitations ... which shall require the application of the best practicable control technology [BPT] currently available." 33 U.S.C. § 1311(b)(1)(A). Second, a permit-holder "*shall ... achiev[e] ... any more stringent limitation,* including those *necessary to meet water quality standards,* treatment standards or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title)." 33 U.S.C. § 1311(b)(1)(C) (emphasis added). Thus, although the BPT requirement takes into account issues of practicability, *see Rybachek v. EPA,* 904 F.2d 1276, 1289 (9th Cir.1990), the EPA also "is under a specific obligation to require that level of effluent control which is needed to implement existing water quality standards without regard to the limits of practicability," *Oklahoma v. EPA,* 908 F.2d 595, 613 (10th Cir.1990) (internal quotation marks omitted), *rev'd on other grounds sub nom. Arkansas v. Oklahoma,* 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). *See also Ackels v. EPA,* 7 F.3d 862, 865–66 (9th Cir.1993) (similar).

The EPA's treatment of storm-water discharges has been the subject of much debate. Initially, the EPA determined that such discharges generally were exempt from the requirements of the CWA (at least when they were uncontaminated by any industrial or commercial activity). *See* 40 C.F.R. § 125.4 (1975).

The Court of Appeals for the District of Columbia, however, invalidated that regulation, holding that "the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402 [33 U.S.C. § 1342]." *Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1377 (D.C.Cir. 1977). "Following this decision, [the] EPA issued proposed and final rules covering storm water discharges in 1980, 1982, 1984, 1985 and 1988. These rules were challenged at the administrative level and in the courts." *American Mining Congress,* 965 F.2d at 763.

Ultimately, in 1987, Congress enacted the Water Quality Act amendments to the CWA. *See NRDC II,* 966 F.2d at 1296 ("Recognizing both the environmental threat posed by storm water runoff and [the] EPA's problems in implementing regulations, Congress passed the Water Quality Act of 1987 containing amendments to the CWA.") (footnotes omitted). Under the Water Quality Act, from 1987 until 1994,[1] most entities discharging storm water did not need to obtain a permit. *See* 33 U.S.C. § 1342(p).

Although the Water Quality Act generally did not require entities discharging storm water to obtain a permit, it did require such a permit for discharges "with respect to which a permit has been issued under this section before February 4, 1987," 33 U.S.C. § 1342(p)(2)(A); discharges "associated with industrial activity," 33 U.S.C. § 1342(p)(2)(B); discharges from a "municipal separate sewer system serving a population of [100,000] or more," 33 U.S.C. § 1342(p)(2)(C) & (D); and "[a] discharge for which the Administrator ... determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States," 33 U.S.C. § 1342(p)(2)(E).

---

1. As enacted, the Water Quality Act extended the exemption to October 1, 1992. Congress later amended the Act to change that date to October 1, 1994. *See* Pub.L. No. 102–580.

When a permit is required for the discharge of storm water, the Water Quality Act sets two different standards:

(A) Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section *and section 1311* of this title.

(B) Municipal discharge

Permits for discharges from municipal storm sewers—

 (i) may be issued on a system or jurisdiction-wide basis;

 (ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

 (iii) *shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator ... determines appropriate for the control of such pollutants.*

33 U.S.C. § 1342(p)(3) (emphasis added).

### C. *Application of Chevron*

■ The EPA and Petitioners argue that the Water Quality Act is ambiguous regarding whether Congress intended for municipalities to comply strictly with state water-quality standards, under 33 U.S.C. § 1311(b)(1)(C). Accordingly, they argue that we must proceed to step two of *Chevron* and defer to the EPA's interpretation that the statute does require strict compliance. *See Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1173 (9th Cir.1999) ("At step two, we must uphold the administrative regulation unless it is arbitrary, capricious, or manifestly contrary to the statute.") (citation and internal quotation marks omitted), *cert. denied,* —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 68 USLW 3129 (1999).

Intervenors and *amici,* on the other hand, argue that the Water Quality Act expresses Congress' intent unambiguously and, thus, that we must stop at step one of *Chevron. See, e.g., National Credit Union*

*Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 118 S.Ct. 927, 938–39, 140 L.Ed.2d 1 (1998) ("Because we conclude that Congress has made it clear that the *same* common bond of occupation must unite each member of an occupationally defined federal credit union, we hold that the NCUA's contrary interpretation is impermissible under the first step of *Chevron.*") (emphasis in original); *Sierra Club v. EPA,* 118 F.3d 1324, 1327 (9th Cir.1997) ("Congress has spoken clearly on the subject and the regulation violates the provisions of the statute. Our inquiry ends at the first prong of *Chevron.*"). We agree with Intervenors and *amici:* For the reasons discussed below, the Water Quality Act unambiguously demonstrates that Congress did not require municipal storm-sewer discharges to comply strictly with 33 U.S.C. § 1311(b)(1)(C). That being so, we end our inquiry at the first step of the *Chevron* analysis.

■ "[Q]uestions of congressional intent that can be answered with 'traditional tools of statutory construction' are still firmly within the province of the courts" under *Chevron. NRDC II,* 966 F.2d at 1297 (citation omitted). "Using our 'traditional tools of statutory construction,' *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694, when interpreting a statute, we look first to the words that Congress used." *Zimmerman,* 170 F.3d at 1173 (alterations, citations, and internal quotation marks omitted). "Rather than focusing just on the word or phrase at issue, we look to the entire statute to determine Congressional intent." *Id.* (alterations, citations, and internal quotation marks omitted).

As is apparent, Congress expressly required *industrial* storm-water discharges to comply with the requirements of 33 U.S.C. § 1311. *See* 33 U.S.C. § 1342(p)(3)(A) ("Permits for discharges associated with industrial activity *shall meet all applicable provisions of* this section and *section 1311* of this title.") (emphasis added). By incorporation, then, in-

dustrial storm-water discharges "*shall ... achiev[e] ... any more stringent limitation,* including those necessary to meet water quality standards, treatment standards or schedules of compliance, established pursuant to any State law or regulation (under authority preserved by section 1370 of this title)." 33 U.S.C. § 1311(b)(1)(C) (emphasis added); *see also* Sally A. Longroy, *The Regulation of Storm Water Runoff and its Impact on Aviation,* 58 J. Air. L. & Com. 555, 565–66 (1993) ("Congress further *singled out* industrial storm water dischargers, all of which are on the high-priority schedule, and requires them to satisfy all provisions of section 301 of the CWA [33 U.S.C. § 1311].... Section 301 further mandates that NPDES permits include requirements that receiving waters meet water quality based standards.") (emphasis added). In other words, industrial discharges must comply strictly with state water-quality standards.

Congress chose not to include a similar provision for municipal storm-sewer discharges. Instead, Congress required municipal storm-sewer discharges "to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator ... determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii).

■ The EPA and Petitioners argue that the difference in wording between the two provisions demonstrates ambiguity. That argument ignores precedent respecting the reading of statutes. Ordinarily, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citation and internal quotation marks omitted); *see also United States v. Hanousek,* 176 F.3d 1116, 1121

(9th Cir.1999) (stating the same principle), *petition for cert. filed,* 68 USLW 3138 (Aug. 23, 1999). Applying that familiar and logical principle, we conclude that Congress' choice to require industrial storm-water discharges to comply with 33 U.S.C. § 1311, but not to include the same requirement for municipal discharges, must be given effect. When we read the two related sections together, we conclude that 33 U.S.C. § 1342(p)(3)(B)(iii) does not require municipal storm-sewer discharges to comply strictly with 33 U.S.C. § 1311(b)(1)(C).

Application of that principle is significantly strengthened here, because 33 U.S.C. § 1342(p)(3)(B) *is not merely silent* regarding whether municipal discharges must comply with 33 U.S.C. § 1311. Instead, § 1342(p)(3)(B)(iii) *replaces* the requirements of § 1311 with the requirement that municipal storm-sewer dischargers "reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator ... determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii). In the circumstances, the statute unambiguously demonstrates that Congress did not require municipal storm-sewer discharges to comply strictly with 33 U.S.C. § 1311(b)(1)(C).

Indeed, the EPA's and Petitioners' interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) would render that provision superfluous, a result that we prefer to avoid so as to give effect to all provisions that Congress has enacted. *See Government of Guam ex rel. Guam Econ. Dev. Auth. v. United States,* 179 F.3d 630, 634 (9th Cir.1999) ("This court generally refuses to interpret a statute in a way that renders a provision superfluous."), *as amended,* 1999 WL 604218 (9th Cir. Aug.12, 1999). As all parties concede, § 1342(p)(3)(B)(iii) creates a lesser standard than § 1311. Thus, if § 1311 continues to apply to municipal storm-sewer dis-

charges, the more stringent requirements of that section always would control.

Contextual clues support the plain meaning of § 1342(p)(3)(B)(iii), which we have described above. The Water Quality Act contains other provisions that undeniably exempt certain discharges from the permit requirement altogether (and therefore from § 1311). For example, "[t]he Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(*l*)(1). Similarly, a permit is not required for certain storm-water runoff from oil, gas, and mining operations. *See* 33 U.S.C. § 1342(*l*)(2). Read in the light of those provisions, Congress' choice to exempt municipal storm-sewer discharges from strict compliance with § 1311 is not so unusual that we should hesitate to give effect to the statutory text, as written.

Finally, our interpretation of § 1342(p)(3)(B)(iii) is supported by this court's decision in *NRDC II*. There, the petitioner had argued that "the EPA has failed to establish substantive controls for municipal storm water discharges as required by the 1987 amendments." *NRDC II*, 966 F.2d at 1308. This court disagreed with the petitioner's interpretation of the amendments:

> Prior to 1987, municipal storm water dischargers were subject to the same substantive control requirements as industrial and other types of storm water. In the 1987 amendments, *Congress retained the existing, stricter controls for industrial storm water dischargers but prescribed new controls for municipal storm water discharge.*

*Id.* (emphasis added). The court concluded that, under 33 U.S.C. § 1342(p)(3)(B)(iii), *"Congress did not mandate a minimum standards approach." Id.* (emphasis added). The question in *NRDC II* was not whether § 1342(p)(3)(B)(iii) required strict compliance with state water-quality standards, *see* 33 U.S.C. § 1311(b)(1)(C). Nonetheless, the court's holding applies equally in

this action and further supports our reading of 33 U.S.C. § 1342(p).

In conclusion, the text of 33 U.S.C. § 1342(p)(3)(B), the structure of the Water Quality Act as a whole, and this court's precedent all demonstrate that Congress did not require municipal storm-sewer discharges to comply strictly with 33 U.S.C. § 1311(b)(1)(C).

**D. *Required Compliance with 33 U.S.C. § 1311(b)(1)(C)***

■ We are left with Intervenors' contention that the EPA may not, under the CWA, require strict compliance with state water-quality standards, through numerical limits or otherwise. We disagree.

Although Congress did not require municipal storm-sewer discharges to comply strictly with § 1311(b)(1)(C), § 1342(p)(3)(B)(iii) states that "[p]ermits for discharges from municipal storm sewers ... shall require ... *such other provisions as the Administrator ... determines appropriate for the control of such pollutants.*" (Emphasis added.) That provision gives the EPA discretion to determine what pollution controls are appropriate. As this court stated in *NRDC II*, "Congress gave the administrator discretion to determine what controls are necessary.... NRDC's argument that the EPA rule is inadequate cannot prevail in the face of the clear statutory language." 966 F.2d at 1308.

Under that discretionary provision, the EPA has the authority to determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants. The EPA also has the authority to require less than strict compliance with state water-quality standards. The EPA has adopted an interim approach, which "uses best management practices (BMPs) in first-round storm water permits ... to provide for the attainment of water quality standards." The EPA applied that approach to the permits at issue here. Under 33 U.S.C. § 1342(p)(3)(B)(iii), the EPA's choice to in-

clude either management practices or numeric limitations in the permits was within its discretion. *See NRDC II*, 966 F.2d at 1308 ("Congress did not mandate a minimum standards approach or specify that [the] EPA develop minimal performance requirements."). In the circumstances, the EPA did not act arbitrarily or capriciously by issuing permits to Intervenors.

PETITION DENIED.