**MINNESOTA CENTER FOR ENVIRONMENTAL AD-VOCACY, Relator,**

v.

**MINNESOTA POLLUTION CONTROL AGENCY, Respondent.**

No. C6–02–1243.

Court of Appeals of Minnesota.

May 6, 2003.

Janette K. Brimmer, St. Paul, for relator.

Mike Hatch, Attorney General, and Paul A. Merwin, Assistant Attorney General, St. Paul, for respondent.

Considered and decided by KALITOWSKI, Presiding Judge, and HUDSON, Judge, and PORITSKY, Judge.

## OPINION

PORITSKY, Judge.*

Respondent issued a general permit covering the discharge of storm water by small municipalities. On certiorari, relator challenges respondent's issuance of the general permit, arguing: (1) the issuance of the general permit violates Minn. R. 7001.0210 because the permittees are not

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

similarly situated; (2) the issuance of the general permit denies the public notice and the ability to comment on the extension of that permit to local municipalities; (3) the issuance of the general permit allows degradation of public waters and therefore violates Minn. R. 7050.0185 and 40 C.F.R. § 131.12; (4) the general permit weakens the federal standard; (5) the general permit is impermissibly vague and violates state and federal water quality standards; (6) respondent relied on non-controlling case law in issuing the general permit; and (7) the general permit does not require appropriate monitoring. We conclude that (1) the general permit violates the Clean Water Act by denying the public notice and the ability to comment; (2) the respondent failed to make a determination of whether the general permit will cover expanded discharges of storm water requiring additional control measures; and (3) the general permit impermissibly departs from the federal standard for reducing pollutants; we reverse and remand. We affirm on all other issues.

## FACTS

Small municipalities that discharge storm water through municipal separate storm sewer systems (MS4s) are subject to regulation by respondent Minnesota Pollution Control Agency (MPCA). MPCA acts pursuant to powers delegated to it by the federal Environmental Protection Agency (EPA). As a result of this delegated power, MPCA has the authority to implement the federal Clean Water Act (CWA) in Minnesota.

The CWA was enacted by Congress in 1972, and it prohibits the discharge of any pollutant into navigable waters of the Unit-

ed States from a point source [1] unless the discharge is authorized by a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1311(a) (2000); 33 U.S.C. § 1342(p)(3)(B) (2000); 40 C.F.R. § 122.26 (2002). MPCA is the authority that issues NPDES permits in Minnesota. EPA initially attempted to exempt municipal storm sewer systems from the requirement to obtain an NPDES permit. But in the Water Quality Act of 1987, Congress amended the CWA to specifically cover storm water discharges from conveyances such as MS4s. 33 U.S.C. § 1342(p) (added by Pub.L. 100–4, Title IV, Feb. 4, 1987). Section (p) governs the granting of permits for MS4s and certain other storm water systems.

As a result of the amendment to the Clean Water Act, large and medium municipalities were required to obtain permit coverage by 1993. Small municipalities, however, were not required to obtain permit coverage until 2003. The large and medium municipalities were referred to as Phase I permittees, while the small municipalities were referred to as Phase II permittees. It is the Phase II permit process that we review in this case.

Thus, in order to discharge storm water from MS4s, the small municipalities must obtain an NPDES permit from MPCA. The Clean Water Act provides that permits for such discharges:

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit nonstormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including manage-

---

1. "Point source" means a discernible, discrete source, such as a pipe, ditch, or conduit. *Cf.* Minn. R. 7001.1020, subp. 23, for a more detailed listing. "Nonpoint source" means

any land management or land use activity that contributes or may contribute to ground or surface water pollution and is not defined as a point source. Minn. R. 7050.0130(C).

ment practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator [of EPA] or the State determines appropriate for the control of such pollutants.

33 U.S.C. § 1342(p)(3)(B).

In early 2002, MPCA sought initial comments on a draft NPDES general permit for storm water discharges by MS4s. A general permit is a permit issued under Minnesota Rules to a "category of permittees whose operations, emissions, activities, discharges, or facilities are the same or substantially similar." Minn. R. 7001.0010, subp. 4. By using a general permit in this case, MPCA utilized a process whereby only the general permit was subject to public notice and comment and other procedures, and each individual permittee needed only to complete an application to obtain coverage under the general permit. Coverage under the permit allows permittees to begin or continue discharging storm water into the waters of the United States.

Relator MCEA submitted comments on the general permit in February 2002 and also appeared at the February 2002 MPCA Citizens Board meeting to present testimony. On March 11, 2002, MPCA published notice of the general permit in the Minnesota State Register. MCEA submitted comments in April 2002, incorporating its February 2002 comments. Also in April 2002, MCEA requested a contested case hearing.

On May 28, 2002, the Board heard testimony from MPCA staff and others regarding the general permit. One subject of comment was MPCA's approach to compliance with Minnesota's non-degradation rules. Minn. R. 7050.0180–0186. The issue was addressed as an informational item, and MCEA and other interested parties had an opportunity to comment on it. At the May 28 meeting, the Board voted to keep the record open for additional comments and submissions through June 4, 2002. MCEA submitted additional comments and materials on June 4, 2002.

MCEA's contested case request and the general permit came before the Board for final approval and hearing on June 25, 2002. At the conclusion of the June 25, 2002, meeting, the Board voted 7–0 to deny MCEA's contested case request in its entirety and 6–1 to approve the general permit as amended June 11.

The MPCA Commissioner executed the Findings of Fact, Conclusions of Law and Order denying the contested case request and approving the general permit on June 28, 2002. The MCEA filed its petition for writ of certiorari on July 25, 2002.

## ISSUES

I. Does the issuance of the general permit violate Minn. R. 7001.0210 because the permittees are not similarly situated?

II. Does the issuance of the general permit impermissibly deprive the public of its right to notice and comment on the discharge of storm water by the MS4s regulated by the permit?

III. Does the general permit violate state non-degradation rules (Minn. R. 7050.0185)?

IV. Does the use of the word *minimize* in the general permit impermissibly weaken the federal standard requiring that permittees *reduce* pollutants to the maximum extent practicable?

V. Is the general permit impermissibly vague and in violation of state and federal water quality standards?

VI. Did respondent erroneously rely on non-controlling case law in issuing the general permit?

VII. Does the general permit meet state monitoring requirements?

## ANALYSIS

■ Final decisions of MPCA are reviewed under Minn.Stat. §§ 14.63–.69 (2002). Minn.Stat. § 115.05, subd. 11 (2002). Minn.Stat. § 14.69 provides that a reviewing court is limited to determining whether the agency decision is

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) unsupported by substantial evidence in view of the entire record as submitted; or

(f) arbitrary or capricious.

Minn.Stat. § 14.69. The relator has the burden of proof when challenging an agency decision in an appeal. *Markwardt v. Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn.1977) (interpreting Minn.Stat. § 15.0425, current version at § 14.69).

■ When reviewing an agency decision, we

adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience.

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). The agency decision-maker is presumed to have the expertise necessary to decide technical matters within the scope of the agency's authority. *In re Special Instruction & Servs. for Pautz,* 295 N.W.2d 635, 637 (Minn.1980). Generally, this court defers to an agency's interpretation of its own rule

when the language subject to construction is so technical in nature that only a specialized agency has the experience and expertise needed to understand it, when the language is ambiguous or when the agency interpretation is one of long standing.

*Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981) (citations omitted). But this court does not give deference to the agency interpretation "if the language of the regulation is clear and capable of understanding." *In re St. Otto's Home v. Minnesota Dep't of Human Servs.,* 437 N.W.2d 35, 40 (Minn.1989) (citations omitted).

## I.

The first issue we consider is whether the issuance of a general permit was appropriate under the Minnesota rule governing general permits. MCEA argues that the issuance of a general permit is not appropriate because respondent MPCA has not found, and cannot find, that the requirements of Minn. R. 7001.0210 have been met.

Rule 7001.0210 provides that an agency may issue a general permit only if the agency finds that all the permittees have same or substantially similar characteristics. Specifically, the rule provides that the agency may only issue a general permit if the agency finds that:

A. there are several permit applicants or potential permit applicants who have the same or substantially similar operations, emissions, activities, discharges, or facilities;

B. the permit applicants or potential permit applicants discharge, emit, process, handle, or dispose of the same types of waste;

C. the operations, emissions, activities, discharges, or facilities are subject to the same or substantially similar stan-

dards, limitations, and operating requirements; and

D. the operations, emissions, activities, discharges, or facilities are subject to the same or substantially similar monitoring requirements.

Minn. R. 7001.0210, subp. 3.

MCEA essentially argues that the issuance of a general permit is inappropriate for both procedural and substantive reasons. MCEA's procedural argument is that Minn. R. 7001.0210, subp. 3 requires MPCA to make explicit findings that the requirements of subpart 3 have been met before MPCA can issue a general permit. MCEA's substantive argument is that the requirements of subpart 3 have not been and cannot be met in this case because the MS4s being regulated do not have similar characteristics.

■ MCEA's procedural argument is not persuasive. The rule says "the agency shall not issue a general permit unless the agency finds," but the rule does not require explicit findings. It is inherent in MPCA's issuance of the general permit that MPCA found that the requirements of subpart 3 had been met.

■ Nor do we find persuasive MCEA's substantive argument that the requirements of subpart 3 cannot be met in this case. We turn first to paragraphs A and B of subpart 3. In each of those paragraphs, the rule lists the common characteristics that must be found and uses the disjunctive word *or*. Minn. R. 7001.0210, subp. 3. Thus, the permittees need only be the same or substantially similar in one characteristic to meet the requirements of paragraphs A and B. The permittees in this case will all be discharging storm water. Both paragraphs A and B list the same or substantially similar discharges as one characteristic that permittees must have in common. Accordingly, the requirements of paragraphs A and B are met.

Paragraphs C and D of subpart 3 require that the permittees be subject to the same or substantially similar standards and monitoring requirements. As applied to this case, paragraph C is met if "discharges * * * are subject to the same or substantially similar standards, limitations, and operating requirements," and paragraph D is met if the "discharges * * * are subject to the same or substantially similar monitoring requirements." In this case, all of the permittees are MS4s, and as such, they are all subject to the same state and federal standards and requirements for discharging storm water.

## II.

■ The general permit in this case provides that as each small municipality applies for coverage under the general permit, the municipality must develop a Storm Water Pollution Prevention Program (SWPPP) and file a summary of that SWPPP with MPCA. MCEA argues that because the individual SWPPP sets forth how permittees will comply with the general permit and because the public does not have an opportunity to be heard on the terms of each SWPPP, the general permit effectively deprives the public of notice and comment. MPCA responds that the public had an opportunity to comment on the terms of the general permit, but that the public does not have a right to comment on how permittees will comply with the permit.

Public participation is a critical means of advancing the goals of the Clean Water Act. 33 U.S.C. § 1251(e); *see also Costle v. Pac. Legal Found.*, 445 U.S. 198, 216, 100 S.Ct. 1095, 1106, 63 L.Ed.2d 329 (1980) (noting the "general policy of encouraging public participation is applicable to the administration of the NPDES permit pro-

gram"). Section 1342(j) of the Clean Water Act requires that "[a] copy of each permit application and each permit issued under [the NPDES program] shall be available to the public." 33 U.S.C. § 1342(j) (2002). And before a permit is approved, the act requires that the public have an opportunity for a hearing. 33 U.S.C. § 1342(a)(1) (2002).

The substantive details for storm water control will be contained in each SWPPP. A municipality obtains immediate coverage under the general permit as soon as the municipality files its application. There is no public notice of the application, nor is there public notice of the SWPPP. There is also no opportunity for public comment or delay of coverage under the general permit. We note, however, that the general permit does require each permittee to file an annual report discussing its compliance with the terms of the SWPPP, and each permittee is required to hold a public meeting to discuss its annual report and consider all public input when evaluating its SWPPP.

In this case, the SWPPPs contain the substantive information on how small municipalities will comply with the Clean Water Act, and MPCA concedes that the SWPPPs are the "core" of the general permit. The SWPPPs are the state equivalent to the permit applications required by the federal Clean Water Act and are subject to the CWA's public availability and public hearing requirements. Neither the single hearing held before the general permit was issued, nor the public meetings to discuss the annual reports after the implementation of the SWPPPs, are substitutes for a public hearing held before the

SWPPPs are implemented. Because there is no opportunity for public hearings on each SWPPP, the general permit procedure violates the public participation requirements of the Clean Water Act.[2] We conclude that the public is entitled to be heard on each SWPPP.

### III.

■ Next we consider MCEA's argument that the issuance of the general permit in this case violates the state nondegradation policy, as contained in Minn. R. 7050.0185, which was enacted pursuant to the EPA's directive in 40 C.F.R. 131.12.

The non-degradation rule is designed to prevent degradation of water quality by freezing pollutant mass loadings, i.e., pollutant levels, at levels no higher than their levels in 1988, when the rule was enacted. Minn. R. 7050.0185. The rule applies to storm water discharges. Minn. R. 7050.0185, subp. 1 ("It is the policy of the state of Minnesota to protect *all waters* from significant degradation from point and nonpoint sources * * *.") (Emphasis added.)

Under the rule, MPCA is required to determine whether additional control measures should be taken to reduce the impact on the receiving water of new or expanded significant discharges.

> If a person proposes a new or expanded significant discharge from either a point or nonpoint source, the agency shall determine whether additional control measures beyond those required by subpart 3 can reasonably be taken to minimize

---

**2.** As we have noted, the general permit procedure allows permittees to obtain coverage under the permit by simply submitting their application. The record does not reflect any review of the applications by MPCA to ensure

that the applications contain the necessary requirements. This lack of review adds to the troubling aspects of the general permit procedure followed in this case.

the impact of the discharge on the receiving water. Minn. R. 7050.0185, subp. 4.

MPCA has not made this determination. MCEA argues that the rule applies in this case and requires MPCA to determine whether additional control measures are necessary. MPCA argues that Rule 7050.0185 does not apply because the storm water discharges in this case are not new or expanded discharges within the meaning of the rule. The rule defines new discharge as a "discharge that was not in existence before January 1, 1988." Minn. R. 7050.0185, subp. 2(A). An expanded discharge is a discharge that

> changes in volume, quality, location or any other manner after January 1, 1988, such that an increased loading of one or more pollutants results. In determining whether an increased loading of one or more pollutants would result from the proposed change in discharge, the agency shall compare the loading that would result from the proposed discharge with the loading allowed by the agency on January 1, 1988.

Minn. R. 7050.0185, subp. 2(B).

While MPCA may be correct that the storm water discharges are not new discharges because municipalities discharged storm water before 1988, it admits that "[a]rguably, there may be some situations in which a permittee's discharge could be new or increased since 1988." The record reflects that populations have increased near the various bodies of water at issue in this case; thus MCEA made a showing that there are expanded significant discharges from MS4s covered by the general permit.

We conclude that MPCA must comply with subpart 2(B) and determine whether the discharges are in fact expanded discharges. We note that even if MPCA determines the discharges are expanded discharges, the agency still has discretion to determine "whether additional control measures beyond those required by subpart 3 can reasonably be taken to minimize the impact of the discharge on the receiving water." Minn. R. 7050.0185, subp. 4.

## IV.

We next address whether the general permit impermissibly weakens the federal standard. Federal law requires that permits for discharges from municipal storm sewers "shall require controls to *reduce* the discharge of pollutants to the maximum extent practicable." 33 U.S.C. § 1342(p)(3)(B)(iii) (2002) (emphasis added). The general permit requires permittees to "*minimize* the discharge of pollutants" to the maximum extent practicable.

MCEA argues the use of the word "minimize" instead of "reduce" is an intentional attempt to weaken the federal standard. MPCA responds that the difference is merely semantic and has no real meaning. If there is no difference between the two words, the general permit should adhere to the federal wording: to use two words with the same meaning would be a source of confusion. If there is, in fact, a difference between the two words, then there is a significant possibility that the general permit does not comply with the federal requirement that the pollutants be "reduced." On remand, MPCA should adhere to the federal standard in the permit.

## V.

Next we consider MCEA's argument that the general permit violates various state and federal water quality standards. Because the only specific standard identified by the MCEA appears in Minn. R. 7001.1080, we will only address whether the general permit violates that rule.

Minn. R. 7001.1080 provides that "[e]xcept as provided in subpart 3, the commissioner shall establish effluent limitations * * * for each pollutant to be discharged." Minn. R. 7001.1080, subp. 2. Subpart 3 of the rule provides as follows:

If the commissioner finds that it is not feasible to establish an effluent limitation, standard, or prohibition using a numerical value, the commissioner shall establish permit conditions requiring the implementation by the permittee of best management practices.

Minn. R. 7001.1080, subp. 3.

 In this case, MPCA found that it was not feasible to establish numerical effluent limitations. MPCA's finding that numerical effluent limitations are not feasible is supported by evidence in the record. MPCA relied on a statement by EPA that

pollutants from wet weather discharges are most appropriately controlled through management measures rather than end-of-pipe numeric effluent limitations. * * * EPA believes that the currently available methodology for derivation of numeric water quality-based effluent limitations is significantly complicated when applied to wet weather discharges from MS4s * * *. Wet weather discharges from MS4s introduce a high degree of variability in the inputs to the models currently available for derivation of water quality based effluent limitations, including assumptions about instream and discharge flow rates, as well as effluent characterization. In addition, EPA anticipates that determining compliance with such numeric limitations may be confounded by practical limitations in sample collection. * * * If the permitting authority * * * needs to impose additional or more specific measures to protect water quality, then that action will most likely be the result of an assessment based on a TMDL or equivalent analysis that determines sources and allocations of pollutant(s) of concern.

(Quoting 64 Fed.Reg. at 68753 (1999)). Giving deference to MPCA's expertise in this area, we uphold MPCA's determination that numerical effluent limitations are not feasible.

## VI.

Next we address whether MPCA impermissibly relied on non-controlling case law in issuing the general permit. MCEA argues that MPCA should not have relied on *Defenders of Wildlife v. Browner,* 191 F.3d 1159 (9th Cir.1999) because it is a ninth circuit case and because the facts of that case are distinguishable from the facts in this case.

 But we do not agree that MPCA "relied" on *Defenders of Wildlife.* In issuing the general permit, MPCA's only reference to that case is:

The federal Clean Water Act does not regulate storm water through water quality based regulation, but instead by requiring the removal of pollutants to the maximum extent practicable. *See Defenders of Wildlife v. Browner,* 191 F.3d at 1165–66.

Additionally, whether MPCA "relied" on *Defenders of Wildlife* is beside the point. The real issue in this case is whether MPCA complied with federal and state law as embodied in rules and statutes. MPCA's citation to *Defenders of Wildlife* has no bearing on whether the issuance of the general permit was proper.

In any event, we note that although the Eighth Circuit has not ruled on the issue, the United States District Court for the District of Minnesota recently ruled on the issue and followed *Defenders of Wildlife. Mississippi River Revival, Inc. v. City of St. Paul,* No. 01–1887, 2002 WL 31767798

**438**

(D.Minn. Dec.2, 2002). In *Mississippi River Revival,* the court noted "unlike industrial storm water discharges, the CWA does not require water quality-based standards for municipal storm water discharges." *Id.* at *5 (citing *Defenders of Wildlife,* 191 F.3d at 1165–66).

## VII.

Finally, we address whether the general permit violates the rule requiring monitoring requirements in permits.

Rule 7001.1080 sets out certain mandatory conditions that must appear in the permit. The rule provides that:

A. In addition to the requirements in part 7001.0150, subpart 2, the commissioner shall establish appropriate monitoring and reporting of monitoring requirements to ensure compliance with permit limitations.

Minn. R. 7001.1080, subp. 5. MCEA does not argue that MPCA failed to comply with Rule 7001.1080. Its argument focuses instead on Rule 7001.0150, which provides:

Each draft and final permit must contain conditions necessary for the permittee to achieve compliance with applicable Minnesota or federal statutes or rules * * * and any conditions that the agency determines to be necessary to protect human health and the environment. *If applicable to the circumstances,* the conditions must include:

\* \* \* \*

B. Requirements for monitoring and testing and reporting of monitoring and testing results. Monitoring and testing requirements must specify the *type, interval, and frequency* of monitoring and testing activities that are sufficient to yield representative data to determine whether there is compliance with the terms and conditions of the permit or

compliance with Minnesota and federal pollution control statutes and rules.

Minn. R. 7001.0150, subp. 2 (emphasis added).

MCEA argues that the general permit violates the monitoring rules because the permit does not specify the type, interval, and frequency of monitoring and testing, which requirements appear in Rule 7001.0150. MPCA contends that the permit does not have to contain the monitoring requirements discussed in Rule 7001.0150 because those requirements are not "applicable to the circumstances."

■ In our view, the rule clearly leaves the matter within the agency's expertise to determine whether additional monitoring requirements are "applicable to the circumstances." MPCA's determination that the specific monitoring requirements in Rule 7001.0150, subp. 2 are not applicable to the circumstances of storm water is the agency's interpretation of its own rule. As we have already noted, we give deference to an agency's interpretation of its own rule, and agency decisions enjoy a presumption of correctness. *Resident v. Noot,* 305 N.W.2d at 312; *In re Pautz,* 295 N.W.2d at 637; *Herbst,* 256 N.W.2d at 824. MCEA has not presented any argument or authority that supports reversing MPCA on this issue. Accordingly, we conclude that the general permit does not violate the rules requiring monitoring requirements in general permits.

## DECISION

Because the general permit violates the Clean Water Act's requirement of public participation; because there is a possibility that the storm water discharges covered by the general permit are expanded discharges; and because the general permit may weaken the federal standard for reducing pollutants by using the word "minimize," we remand the general permit to

MPCA for further proceedings consistent with this opinion.

**Reversed and remanded.**