[No. D042385. Fourth Dist., Div. One. Dec. 7, 2004.]

BUILDING INDUSTRY ASSOCIATION OF SAN DIEGO COUNTY et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents;
SAN DIEGO BAYKEEPER et al., Interveners and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion parts III, IV, V, VI and VII.

**COUNSEL**

Latham & Watkins, David L. Mulliken, Eric M. Katz, Paul N. Singarella, Kelly E. Richardson and Daniel P. Brunton for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Mary Hackenbracht, Assistant Attorney General, Carol A. Squire, David Robinson and Deborah Fletcher, Deputy Attorneys General, for Defendants and Respondents.

David S. Beckman, Heather L. Hoecherl, Anjali I. Jaiswal and Dan L. Gildor for Interveners and Respondents.

Marco Gonzalez for Intervener and Respondent San Diego BayKeeper.

Law Offices of Rory Wicks and Rory R. Wicks for Surfrider Foundation, Waterkeeper Alliance, The Ocean Conservancy, Heal the Bay, Environmental Defense Center, Santa Monica BayKeeper, Orange County CoastKeeper, Ventura CoastKeeper, Environmental Health Coalition, CalBeach Advocates, San Diego Audubon Society, Endangered Habitats League and Sierra Club as Amici Curiae on behalf of Defendants and Respondents and Interveners and Respondents.

## Opinion

**HALLER, J.**—This case concerns the environmental regulation of municipal storm sewers that carry excess water runoff to lakes, lagoons, rivers, bays, and the ocean. The waters flowing through these sewer systems have accumulated numerous harmful pollutants that are then discharged into the water body without receiving any treatment. To protect against the resulting water quality impairment, federal and state laws impose regulatory controls on storm sewer discharges. In particular, municipalities and other public entities are required to obtain, and comply with, a regulatory permit limiting the quantity and quality of water runoff that can be discharged from these storm sewer systems.

In this case, the California Regional Water Control Board, San Diego Region, (Regional Water Board) conducted numerous public hearings and then issued a comprehensive municipal storm sewer permit governing 19 local public entities. Although these entities did not bring an administrative challenge to the permit, one business organization, the Building Industry Association of San Diego County (Building Industry), filed an administrative appeal with the State Water Resources Control Board (State Water Board). After making some modifications to the permit, the State Water Board denied the appeal. Building Industry then petitioned for a writ of mandate in the superior court, asserting numerous claims, including that the permit violates state and federal law because the permit provisions are too stringent and impossible to satisfy. Three environmental groups intervened as defendants in the action. After a hearing, the trial court found Building Industry failed to prove its claims and entered judgment in favor of the administrative agencies (the Water Boards) and the intervener environmental groups.

On appeal, Building Industry's main contention is that the regulatory permit violates federal law because it allows the Water Boards to impose municipal storm sewer control measures more stringent than a federal standard known as "maximum extent practicable." (33 U.S.C. § 1342(p)(3)(B)(iii).)[2] In the published portion of this opinion, we reject this contention, and conclude the Water Boards had the authority to include a permit provision requiring compliance with state water quality standards. In the unpublished portion of the opinion, we find Building Industry's additional contentions to be without merit. We affirm the judgment.

---

[2] Further statutory references are to title 33 of the United States Code, unless otherwise specified.

RELEVANT BACKGROUND INFORMATION

I. *Summary of Relevant Clean Water Act Provisions*

Before setting forth the factual background of this particular case, it is helpful to summarize the federal and state statutory schemes for regulating municipal storm sewer discharges.[3]

A. *Federal Statutory Scheme*

When the United States Congress first enacted the Federal Water Pollution Control Act in 1948, the Congress relied primarily on state and local enforcement efforts to remedy water pollution problems. (*Middlesex Cty. Sewerage Auth. v. Sea Clammers* (1981) 453 U.S. 1, 11 [69 L.Ed.2d 435, 101 S.Ct. 2615]; *Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1433 [259 Cal.Rptr. 132].) However, by the early 1970's, it became apparent that this reliance on local enforcement was ineffective and had resulted in the "accelerating environmental degradation of rivers, lakes, and streams . . . ." (*Natural Resources Defense Council, Inc. v. Costle* (D.C. Cir. 1977) 568 F.2d 1369, 1371 (*Costle*); see *EPA v. State Water Resources Control Board* (1976) 426 U.S. 200, 203 [48 L.Ed.2d 578, 96 S.Ct. 2022].) In response, in 1972 Congress substantially amended this law by mandating compliance with various minimum technological effluent standards established by the federal government and creating a comprehensive regulatory scheme to implement these laws. (See *EPA v. State Water Resources Control Board*, *supra*, 426 U.S. at pp. 204–205.) The objective of this law, now commonly known as the Clean Water Act, was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (§ 1251(a).)

■ The Clean Water Act employs the basic strategy of prohibiting pollutant emissions from "point sources"[4] unless the party discharging the pollutants obtains a permit, known as an NPDES[5] permit. (See *EPA v. State Water Resources Control Board*, *supra*, 426 U.S. at p. 205.) It is "unlawful

---

[3] The systems that carry untreated urban water runoff to receiving water bodies are known as "[m]unicipal separate storm sewer" systems (40 C.F.R. § 122.26(b)(8)), and are often referred to as "MS4s" (40 C.F.R. § 122.30). For readability, we will identify these systems as municipal storm sewers. To avoid confusion in this case, we will generally use descriptive names, rather than initials or acronyms, when referring to parties and concepts.

[4] The Clean Water Act defines a "point source" to be "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (§ 1362(14).)

[5] NPDES stands for National Pollution Discharge Elimination System.

for any person to discharge a pollutant without obtaining a permit and complying with its terms." (*Ibid.*; see § 1311(a); *Costle, supra,* 568 F.2d at p. 1375.) An NPDES permit is issued by the United States Environmental Protection Agency (EPA) or by a state that has a federally approved water quality program. (§ 1342(a), (b); *EPA v. State Water Resources Control Board, supra,* 426 U.S. at p. 209.) Before an NPDES is issued, the federal or state regulatory agency must follow an extensive administrative hearing procedure. (See 40 C.F.R. §§ 124.3, 124.6, 124.8, 124.10; see generally Wardzinski et al., *National Pollutant Discharge Elimination System Permit Application and Issuance Procedures,* in The Clean Water Act Handbook (Evans edit., 1994) pp. 72–74 (Clean Water Act Handbook).) NPDES permits are valid for five years. (§ 1342(b)(1)(B).)

 Under the Clean Water Act, the proper scope of the controls in an NPDES permit depends on the applicable state water quality standards for the affected water bodies. (See *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1092 [1 Cal.Rptr.3d 76].) Each state is required to develop water quality standards that establish " 'the desired condition of a waterway.' " (*Ibid.*) A water quality standard for any given water segment has two components: (1) the designated beneficial uses of the water body; and (2) the water quality criteria sufficient to protect those uses. (*Ibid.*) As enacted in 1972, the Clean Water Act mandated that an NPDES permit require compliance with state water quality standards and that this goal be met by setting forth a specific "effluent limitation," which is a restriction on the amount of pollutants that may be discharged at the point source. (§§ 1311, 1362(11).)

Shortly after the 1972 legislation, the EPA promulgated regulations exempting most municipal storm sewers from the NPDES permit requirements. (*Costle, supra,* 568 F.2d at p. 1372; see *Defenders of Wildlife v. Browner* (9th Cir. 1999) 191 F.3d 1159, 1163 (*Defenders of Wildlife*).) When environmental groups challenged this exemption in federal court, the Ninth Circuit held a storm sewer is a point source and the EPA did not have the authority to exempt categories of point sources from the Clean Water Act's NPDES permit requirements. (*Costle, supra,* 568 F.2d at pp. 1374–1383.) The *Costle* court rejected the EPA's argument that effluent-based storm sewer regulation was administratively infeasible because of the variable nature of storm water pollution and the number of affected storm sewers throughout the country. (*Id.* at pp. 1377–1382.) Although the court acknowledged the practical problems relating to storm sewer regulation, the court found the EPA had the flexibility under the Clean Water Act to design regulations that would overcome these problems. (*Id.* at pp. 1379–1383.)

During the next 15 years, the EPA made numerous attempts to reconcile the statutory requirement of point source regulation with the practical problem of regulating possibly millions of diverse point source discharges of storm water. (*Defenders of Wildlife, supra,* 191 F.3d at p. 1163; see Gallagher, *Clean Water Act* in Environmental Law Handbook (Sullivan edit., 2003) p. 300 (Environmental Law Handbook); Eisen, *Toward a Sustainable Urbanism: Lessons from Federal Regulation of Urban Stormwater Runoff* (1995) 48 Wash. U. J. Urb. & Contemp. L. 1, 40–41 (*Regulation of Urban Stormwater Runoff*).)

■ Eventually, in 1987, Congress amended the Clean Water Act to add provisions that specifically concerned NPDES permit requirements for storm sewer discharges. (§ 1342(p); see *Defenders of Wildlife, supra,* 191 F.3d at p. 1163; *Natural Resources Defense Council v. U.S. E.P.A.* (1992) 966 F.2d 1292, 1296.) In these amendments, enacted as part of the Water Quality Act of 1987, Congress distinguished between industrial and municipal storm water discharges. With respect to *industrial* storm water discharges, Congress provided that NPDES permits "shall meet all applicable provisions of this section and section 1311 [requiring the EPA to establish effluent limitations under specific timetables] . . . ." (§ 1342(p)(3)(A).) With respect to *municipal* storm water discharges, Congress clarified that the EPA had the authority to fashion NPDES permit requirements to meet water quality standards without specific numerical effluent limits and instead to impose "controls to reduce the discharge of pollutants to the maximum extent practicable . . . ." (§ 1342(p)(3)(B)(iii); see *Defenders of Wildlife, supra,* 191 F.3d at p. 1163.) Because the statutory language pertaining to municipal storm sewers is at the center of this appeal, we quote the relevant portion of the statute in full:

"(B) . . . Permits for discharges from municipal storm sewers—

"(i) may be issued on a system- or jurisdiction-wide basis;

"(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

"(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants." (§ 1342(p)(3)(B).)

To ensure this scheme would be administratively workable, Congress placed a moratorium on many new types of required stormwater permits until 1994 (§ 1342(p)(1)), and created a phased approach to necessary municipal

stormwater permitting depending on the size of the municipality (§ 1342(p)(2)(D)). (See *Environmental Defense Center, Inc. v. U.S. E.P.A.* (9th Cir. 2003) 344 F.3d 832, 841–842.)

## B. *State Statutory Scheme*

Three years before the 1972 Clean Water Act, the California Legislature enacted its own water quality protection legislation, the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), seeking to "attain the highest water quality which is reasonable . . . ." (Wat. Code, § 13000.) The Porter-Cologne Act created the State Water Board to formulate statewide water quality policy and established nine regional boards to prepare water quality plans (known as basin plans) and issue permits governing the discharge of waste. (Wat. Code, §§ 13100, 13140, 13200, 13201, 13240, 13241, 13243.) The Porter-Cologne Act identified these permits as "waste discharge requirements," and provided that the waste discharge requirements must mandate compliance with the applicable regional water quality control plan. (Wat. Code, §§ 13263, subd. (a), 13377, 13374.)

Shortly after Congress enacted the Clean Water Act in 1972, the California Legislature added chapter 5.5 to the Porter-Cologne Act, for the purpose of adopting the necessary federal requirements to ensure it would obtain EPA approval to issue NPDES permits. (Wat. Code, § 13370, subd. (c).) As part of these amendments, the Legislature provided that the state and regional water boards "shall, as required or authorized by the [Clean Water Act], issue waste discharge requirements . . . which apply and ensure compliance with all applicable provisions [of the Clean Water Act], together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance." (Wat. Code, § 13377.) Water Code section 13374 provides that "[t]he term 'waste discharge requirements' as referred to in this division is the equivalent of the term 'permits' as used in the [Clean Water Act]."

■ California subsequently obtained the required approval to issue NPDES permits. (*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1453 [126 Cal.Rptr.2d 389].) Thus, the waste discharge requirements issued by the regional water boards ordinarily also serve as NPDES permits under federal law. (Wat. Code, § 13374.)

## II. *The NPDES Permit at Issue in this Case*

Under its delegated authority and after numerous public hearings, in February 2001 the Regional Water Board issued a 52-page NPDES permit

and Waste Discharge Requirements (the Permit) governing municipal storm sewers owned by San Diego County, the San Diego Unified Port District, and 18 San Diego-area cities (collectively, Municipalities).[6] The first 10 pages of the Permit contain the Regional Water Board's detailed factual findings. These findings describe the manner in which San Diego-area water runoff absorbs numerous harmful pollutants and then is conveyed by municipal storm sewers into local waters without any treatment. The findings state that these storm sewer discharges are a leading cause of water quality impairment in the San Diego region, endangering aquatic life and human health. The findings further state that to achieve applicable state water quality objectives, it is necessary not only to require municipalities to comply with existing pollution-control technologies, but also to require compliance with applicable "receiving water limits" (state water quality standards) and to employ an "iterative process" of "development, implementation, monitoring, and assessment" to improve existing technologies.

Based on these factual findings, the Regional Water Board included in the Permit several overall prohibitions applicable to municipal storm sewer discharges. Of critical importance to this appeal, these prohibitions concern two categories of restrictions. First, the Municipalities are prohibited from discharging those pollutants "which have not been reduced to the *maximum extent practicable* . . . ."[7] (Italics added). Second, the Municipalities are prohibited from discharging pollutants "which cause or contribute to exceedances of receiving water quality objectives . . ." and/or that "cause or contribute to the violation of water quality standards . . . ." This second category of restrictions (referred to in this opinion as the Water Quality Standards provisions) essentially provide that a municipality may not discharge pollutants if those pollutants would cause the receiving water body to exceed the applicable water quality standard. It is these latter restrictions that are challenged by Building Industry in this appeal.

---

[6] Under the Clean Water Act, entities responsible for NPDES permit conditions pertaining to their own discharges are referred to as "copermittees." (40 C.F.R. § 122.26(b)(1).) For clarity and readability, we shall refer to these entities as Municipalities.

[7] The Permit does not precisely define this phrase, and instead, in its definition section, contains a lengthy discussion of the variable nature of the maximum extent practicable concept, referred to as MEP. A portion of this discussion is as follows: "[T]he definition of MEP is dynamic and will be defined by the following process over time: municipalities propose their definition of MEP by way of their [local storm sewer plan]. Their total collective and individual activities conducted pursuant to the [plan] becomes their proposal for MEP as it applies both to their overall effort, as well as to specific activities (e.g., MEP for street sweeping, or MEP for municipal separate storm sewer maintenance). In the absence of a proposal acceptable to the [Regional Water Board], the [Regional Water Board] defines MEP." The definition also identifies several factors that are "useful" in determining whether an entity has achieved the maximum extent practicable standard, including "Effectiveness," "Regulatory Compliance," "Public Acceptance," "Cost," and "Technical Feasibility."

Part C of the Permit (as amended) qualifies the Water Quality Standards provisions by detailing a procedure for enforcing violations of those standards through a step-by-step process of "timely implementation of control measures . . . ," known as an "iterative" process. Under this procedure, when a municipality "caus[es] or contribute[s] to an exceedance of an applicable water quality standard," the municipality must prepare a report documenting the violation and describing a process for improvement and prevention of further violations. The municipality and the regional water board must then work together at improving methods and monitoring progress to achieve compliance. But the final provision of Part C states that "Nothing in this section shall prevent the [Regional Water Board] from enforcing any provision of this Order while the [municipality] prepares and implements the above report."

In addition to these broad prohibitions and enforcement provisions, the Permit requires the Municipalities to implement, or to require businesses and residents to implement, various pollution control measures referred to as "best management practices," which reflect techniques for preventing, slowing, retaining or absorbing pollutants· produced by stormwater runoff. These best management practices include structural controls that minimize contact between pollutants and flows, and nonstructural controls such as educational and public outreach programs. The Permit also requires the Municipalities to regulate discharges associated with new development and redevelopment and to ensure a completed project will not result in significantly increased discharges of pollution from storm water runoff.

### III. *Administrative and Trial Court Challenges*

After the Regional Water Board issued the Permit, the Building Industry, an organization representing the interests of numerous construction-related businesses, filed an administrative challenge with the State Water Board. Although none of the Municipalities joined in the administrative appeal, Building Industry claimed its own independent standing based on its assertion that the Permit would impose indirect obligations on the regional building community. (See Wat. Code, § 13320 [permitting any "aggrieved person" to challenge regional water board action].) Among its numerous contentions, Building Industry argued that the Water Quality Standards provisions in the Permit require strict compliance with state water quality standards beyond what is "practicable" and therefore violate federal law.

In November 2001, the State Water Board issued a written decision rejecting Building Industry's appeal after making certain modifications to the Permit. (Cal. Wat. Resources Control Bd. Order WQ2001-15 (Nov. 15, 2001).) Of particular relevance here, the State Water Board modified the Permit to make clear that the iterative enforcement process applied to the Water Quality Standards provisions in the Permit. But

the State Water Board did not delete the Permit's provision stating that the Regional Water Board retains the authority to enforce the Water Quality Standards provisions even if a Municipality is engaged in this iterative process.

Building Industry then brought a superior court action against the Water Boards, challenging the Regional Board's issuance of the Permit and the State Water Board's denial of Building Industry's administrative challenge.[8] Building Industry asserted numerous legal claims, including that the Water Boards: (1) violated the Clean Water Act by imposing a standard greater than the "maximum extent practicable" standard; (2) violated state law by failing to consider various statutory factors before issuing the Permit; (3) violated the California Environmental Quality Act (CEQA) by failing to prepare an environmental impact report (EIR); and (4) made findings that were factually unsupported.

Three environmental organizations, San Diego BayKeeper, Natural Resources Defense Council, and California CoastKeeper (collectively, Environmental Organizations), requested permission to file a complaint in intervention, seeking to uphold the Permit and asserting a direct and substantial independent interest in the subject of the action. Over Building Industry's objections, the trial court permitted these organizations to file the complaint and enter the action as parties-interveners.

After reviewing the lengthy administrative record and the parties' briefs, and conducting an oral hearing, the superior court ruled in favor of the Water Boards and Environmental Organizations (collectively, respondents). Applying the independent judgment test, the court found Building Industry failed to meet its burden to establish the State Water Board abused its discretion in approving the Permit or that the administrative findings are contrary to the weight of the evidence. In particular, the court found Building Industry failed to establish the Permit requirements were "impracticable under federal law or unreasonable under state law," and noted that there was evidence showing the Regional Water Board considered many practical aspects of the regulatory

---

[8] Several other parties were also named as petitioners: Building Industry Legal Defense Foundation, California Business Properties Association, Construction Industry Coalition for Water Quality, San Diego County Fire Districts Association, and the City of San Marcos. However, because these entities were not parties in the administrative challenge, the superior court properly found they were precluded by the administrative exhaustion doctrine from challenging the administrative agencies' compliance with the federal and state water quality laws. Although these entities were named as appellants in the notice of appeal, they are barred by the exhaustion doctrine from asserting appellate contentions concerning compliance with federal and state water quality laws. However, as to any other claims (such as CEQA), these entities are proper appellants. For ease of reference and where appropriate, we refer to the appellants collectively as Building Industry.

controls before issuing the Permit. Rejecting Building Industry's legal arguments, the court also stated that under federal law the Water Boards had the discretion "to require strict compliance with water quality standards" or "to require less than strict compliance with water quality standards." The court also sustained several of respondents' evidentiary objections, including to documents relating to the legislative history of the Clean Water Act.

Building Industry appeals, challenging the superior court's determination that the Permit did not violate the federal Clean Water Act. In its appeal, Building Industry does not reassert its claim that the Permit violates state law, except for its contentions pertaining to CEQA.

## DISCUSSION

### I. *Standard of Review*

■ A party aggrieved by a final decision of the State Water Board may obtain review of the decision by filing a timely petition for writ of mandate in the superior court. (Wat. Code, § 13330, subd. (a).) Code of Civil Procedure section 1094.5 governs the proceedings, and the superior court must exercise its independent judgment in examining the evidence and resolving factual disputes. (Wat. Code, § 13330, subd. (d).) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].)

■ In reviewing the trial court's factual determinations on the administrative record, a Court of Appeal applies a substantial evidence standard. (*Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 824.) However, in reviewing the trial court's legal determinations, an appellate court conducts a de novo review. (See *Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129 [133 Cal.Rptr.2d 249].) Thus, we are not bound by the legal determinations made by the state or regional agencies or by the trial court. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute.[9] (*Ibid.*)

---

[9] We note that in determining the meaning of the Clean Water Act and its amendments, federal courts generally defer to the EPA's statutory construction if the disputed portion of the statute is ambiguous. (See *Chevron U.S.A. v. Natural Res. Def. Council, Inc.* (1984) 467 U.S. 837, 842–844 [81 L.Ed.2d 694, 104 S.Ct. 2778] (*Chevron*).) However, the parties do not argue this same principle applies to a *state agency's* interpretation of the Clean Water Act. Nonetheless, under governing state law principles, we do consider and give due deference to

## II. *Water Boards' Authority to Enforce Water Quality Standards in NPDES Permit*

Building Industry's main appellate contention is very narrow. Building Industry argues that two provisions in the Permit (the Water Quality Standards provisions) violate federal law because they prohibit the Municipalities from discharging runoff from storm sewers if the discharge would cause a water body to exceed the applicable water quality standard established under state law.[10] Building Industry contends that under federal law the "maximum extent practicable" standard is the "exclusive" measure that may be applied to municipal storm sewer discharges and a regulatory agency may not require a Municipality to comply with a state water quality standard if the required controls exceed a "maximum extent practicable" standard.

In the following discussion, we first reject respondents' contentions that Building Industry waived these arguments by failing to raise a substantial evidence challenge to the court's factual findings and/or to reassert its state law challenges on appeal. We then focus on the portion of the Clean Water Act (§ 1342(p)(3)(B)(iii)) that Building Industry contends is violated by the challenged Permit provisions. On our de novo review of this legal issue, we conclude the Permit's Water Quality Standards provisions are proper under federal law, and Building Industry's legal challenges are unsupported by the applicable statutory language, legislative purpose, and legislative history.

### A. *Building Industry Did Not Waive the Legal Argument*

Respondents (the Water Boards and Environmental Organizations) initially argue that Building Industry waived its right to challenge the Permit's consistency with the maximum extent practicable standard because Building Industry did not challenge the trial court's *factual* findings that Building Industry failed to prove any of the Permit requirements were "impracticable" or "unreasonable."

In taking this position, respondents misconstrue the nature of Building Industry's appellate contention challenging the Water Quality Standards provisions. Building Industry's contention concerns the scope of the authority given to the Regional Water Board under the Permit terms. Specifically,

---

the Water Boards' statutory interpretations in this case. (See *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 7–8.)

[10] These challenged Permit provisions state "Discharges from [storm sewers] which cause or contribute to exceedances of receiving water quality objectives for surface water or groundwater are prohibited" (Permit, § A.2), and "Discharges from [storm sewers] that cause or contribute to the violation of water quality standards . . . are prohibited" (Permit, § C.1).

Building Industry argues that the Regional Water Board does not have the authority to require the Municipalities to adhere to the applicable water quality standards because federal law provides that the "maximum extent practicable" standard is the exclusive standard that may be applied to storm sewer regulation. This argument—concerning the proper scope of a regulatory agency's authority—presents a purely legal issue, and is not dependent on the court's factual findings regarding the practicality of the specific regulatory controls identified in the Permit.

Respondents alternatively contend that Building Industry waived its right to challenge the propriety of the Water Quality Standards provisions under federal law because the trial court found the provisions were valid under state law and Building Industry failed to reassert its state law challenges on appeal. Under the particular circumstances of this case, we conclude Building Industry did not waive its rights to challenge the Permit under federal law.

■ Although it is well settled that the Clean Water Act authorizes states to impose water quality controls that are more stringent than are required under federal law (§ 1370; see *PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology* (1994) 511 U.S. 700, 705 [128 L.Ed.2d 716, 114 S.Ct. 1900]; *Northwest Environmental Advocates v. Portland* (9th Cir. 1995) 56 F.3d 979, 989), and California law specifically allows the imposition of controls more stringent than federal law (Wat. Code, § 13377), the Water Boards made a tactical decision in the superior court to assert the Permit's validity based solely on federal law, and repeatedly made clear they were not seeking to justify the Permit requirements based on the Boards' independent authority to act under state law. On appeal, the Water Boards continue to rely primarily on federal law to uphold the Permit requirements, and their assertions that we may decide the matter based solely on state law are in the nature of asides rather than direct arguments. On this record, it would be improper to rely solely on state law to uphold the challenged Permit provisions.

### B. *The Water Quality Standards Requirement Does Not Violate Federal Law*

We now turn to Building Industry's main substantive contention on appeal—that the Permit's Water Quality Standards provisions (fn. 10, *ante*) violate federal law. Building Industry's contention rests on its interpretation of the 1987 Water Quality Act amendments containing NPDES requirements for municipal storm sewers. The portion of the relevant statute reads: "(B) . . . Permits for discharges from municipal storm sewers . . . [¶] . . . [¶] (iii) shall require controls to reduce the discharge of pollutants to the *maximum extent practicable, including* management practices, control techniques and

system, design and engineering methods, and such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants." (§ 1342(p)(3)(B)(iii), italics added.)

## 1. *Statutory Language*

Focusing on the first 14 words of subdivision (iii), Building Industry contends the statute means that the maximum extent practicable standard sets the upper limit on the type of control that can be used in an NPDES permit, and that each of the phrases following the word *"including"* identify examples of "maximum extent practicable" controls. (§ 1342(p)(3)(B)(iii), italics added.) Building Industry thus reads the final "and such other provisions" clause as providing the EPA with the authority only to include *other* types of "maximum extent practicable" controls in an NPDES storm sewer permit.

Respondents counter that the term "including" refers only to the three identified types of pollution control procedures—(1) "management practices"; (2) "control techniques"; and (3) "system, design and engineering methods"—and that the last phrase, *"and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants,"* provides the EPA (or the approved state regulatory agency) the specific authority to go beyond the maximum extent practicable standard to impose effluent limitations or water-quality based standards in an NPDES permit. In support, respondents argue that because the word "system" in section 1342(p)(3)(B)(iii) is singular, it necessarily follows from parallel-construction grammar principles that the word "system" is part of the phrase "system, design and engineering methods" rather than the phrase "control techniques and system." Under this view and given the absence of a comma after the word "techniques," respondents argue that the "and such other provisions" clause cannot be fairly read as restricted by the "maximum extent practicable" phrase, and instead the "and such other provisions" clause is a separate and distinct clause that acts as a second direct object to the verb "require" in the sentence. (§ 1342(p)(3)(B)(iii).)

Building Industry responds that respondents' proposed statutory interpretation is "not logical" because if the "and such other provisions" phrase is the direct object of the verb "require," the sentence would not make sense. Building Industry states that "permits" do not generally "require" provisions; they "include" or "contain" them.

■ As a matter of grammar and word choice, respondents have the stronger position. The second part of Building Industry's proposed interpretation—"control techniques and system, design and engineering methods"—without a comma after the word "techniques" does not logically serve as a

parallel construct with the "and such other provisions" clause. Moreover, we disagree that the "and such other provisions" clause cannot be a direct object to the word "require." (§ 1342(p)(3)(B)(iii).) Although it is not the clearest way of articulating the concept, the language of section 1342(p)(3)(B)(iii) does communicate the basic principle that the EPA (and/or a state approved to issue the NPDES permit) retains the discretion to impose "appropriate" water pollution controls in addition to those that come within the definition of " 'maximum extent practicable.' " (*Defenders of Wildlife, supra,* 191 F.3d at pp. 1165–1167.) We find unpersuasive Building Industry's reliance on several statutory interpretation concepts, *ejusdem generis, noscitur a sociis,* and *expressio unius est exclusion alterius,* to support its narrower statutory construction.

2. *Purpose and History of Section 1342(p)(3)(B)(iii)*

Further, "[w]hile punctuation and grammar should be considered in interpreting a statute, neither is controlling unless the result is in harmony with the clearly expressed intent of the Legislature." (*In re John S.* (2001) 88 Cal.App.4th 1140, 1144, fn. 1 [106 Cal.Rptr.2d 476]; see *Estate of Coffee* (1941) 19 Cal.2d 248, 251 [120 P.2d 661].) If the statutory language is susceptible to more than one reasonable interpretation, a court must also "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

The legislative purpose underlying the Water Quality Act of 1987, and section 1342(p) in particular, supports that Congress intended to provide the EPA (or the regulatory agency of an approved state) the discretion to require compliance with water quality standards in a municipal storm sewer NPDES permit, particularly where, as here, that compliance will be achieved primarily through an iterative process.

Before section 1342(p) was enacted, the courts had long recognized that the EPA had the authority to require a party to comply with a state water quality standard even if that standard had not been translated into an effluent limitation. (See *EPA v. State Water Resources Control Board, supra,* 426 U.S. at p. 205, fn. 12; *PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology, supra,* 511 U.S. at p. 715; *Northwest Environmental Advocates v. Portland* (9th Cir. 1995) 56 F.3d 979, 987; *Natural Resources Defense Council v. U.S.E.P.A.* (9th Cir. 1990) 915 F.2d 1314, 1316.) Specifically, section 1311(b)(1)(C) gave the regulatory agency the authority to impose "any more stringent limitation, including those necessary to meet water quality standards," and section 1342(a)(2) provided that "[t]he [EPA] Administrator shall

prescribe conditions for [NPDES] permits to assure compliance" with requirements identified in section 1342(a)(1), which encompass state water quality standards. The United States Supreme Court explained that when Congress enacted the 1972 Clean Water Act, it retained "[w]ater quality standards . . . as a supplementary basis for effluent limitations, . . . so that numerous point sources despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels. . . . " (*EPA v. State Water Resources Control Board, supra,* 426 U.S. at p. 205, fn. 12; see also *Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046].)

There is nothing in section 1342(p)(3)(B)(iii)'s statutory language or legislative history showing that Congress intended to eliminate this discretion when it amended the Clean Water Act in 1987. To the contrary, Congress added the NPDES storm sewer requirements to strengthen the Clean Water Act by making its mandate correspond to the practical realities of municipal storm sewer regulation. As numerous commentators have pointed out, although Congress was reacting to the physical differences between municipal storm water runoff and other pollutant discharges that made the 1972 legislation's blanket effluent limitations approach impractical and administratively burdensome, the primary point of the legislation was to address these administrative problems while giving the administrative bodies the tools to meet the fundamental goals of the Clean Water Act in the context of stormwater pollution. (See *Regulation of Urban Stormwater Runoff, supra,* 48 Wash. U. J. Urb. & Contemp. L. at pp. 44–46; Environmental Law Handbook, *supra,* at p. 300; Clean Water Act Handbook, *supra,* at pp. 62–63.) In the 1987 congressional debates, the Senators and Representatives emphasized the need to prevent the widespread and escalating problems resulting from untreated storm water toxic discharges that were threatening aquatic life and creating conditions dangerous to human health. (See Remarks of Sen. Durenberger, 133 Cong. Rec. 1279 (Jan. 14, 1987); Remarks of Sen. Chaffee, 133 Cong. Rec. S738 (daily ed. Jan 14, 1987); Remarks of Rep. Hammerschmidt, 133 Cong. Rec. 986 (Jan. 8, 1987); Remarks of Rep. Roe, 133 Cong. Rec. 1006, 1007 (Jan. 8, 1987); Remarks of Sen. Stafford, 132 Cong. Rec. 32381, 32400 (Oct. 16, 1986).) This legislative history supports that in identifying a maximum extent practicable standard Congress did not intend to substantively bar the EPA/state agency from imposing a more stringent water quality standard if the agency, based on its expertise and technical factual information and after the required administrative hearing procedure, found this standard to be a necessary and workable enforcement mechanism to achieving the goals of the Clean Water Act.

To support a contrary view, Building Industry relies on comments by Minnesota Senator David Durenberger during the lengthy congressional

debates on the 1987 Water Quality Act amendments.[11] (132 Cong. Rec. 32400 (Oct. 16, 1986); 133 Cong. Rec. S752 (daily ed. Jan. 14, 1987.) In the cited portions of the Congressional Record, Senator Durenberger states that NPDES permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable. Such controls include management practices, control techniques and systems, design and engineering methods, and such other provisions, as the Administrator determines appropriate for the control of pollutants in the stormwater discharge." (*Ibid.*) When viewing these statements in context, it is apparent that the Senator was merely paraphrasing the words of the proposed statute and was not intending to address the issue of whether the maximum extent practicable standard was a regulatory ceiling or whether he believed the proposed amendments limited the EPA's existing discretion.[12]

Building Industry's reliance on comments made by Georgia Representative James Rowland, who participated in drafting the 1987 Water Quality Act amendments, is similarly unhelpful. During a floor debate on the proposed amendments, Representative Rowland noted that cities have "millions of" stormwater discharge points and emphasized the devastating financial burden on cities if they were required to obtain a permit for each of these points. (133 Cong. Rec. 522 (daily ed. Feb. 3, 1987).) Representative Rowland then explained that the amendments would address this problem by "allow[ing] communities to obtain far less costly single jurisdictionwide permits." (*Ibid.*) Viewed in context, these comments were directed at the need for statutory provisions permitting the EPA to issue jurisdiction-wide permits thereby preventing unnecessary administrative costs to the cities, and do not reflect a desire to protect cities from the cost of complying with strict water quality standards when deemed necessary by the regulatory agency.

### 3. *Interpretations by the EPA and Other Courts*

 Our conclusion that Congress intended section 1342(p)(3)(B)(iii) to provide the regulatory agency with authority to impose standards stricter than a "maximum extent practicable" standard is consistent with interpretations by

---

[11] We agree with Building Industry that the trial court's refusal to consider this legislative history on the basis that it was not presented to the administrative agencies was improper. However, this error was not prejudicial because we apply a de novo review standard in interpreting the relevant statutes.

[12] In the cited remarks, Senator Durenberger in fact expressed his dissatisfaction with the EPA's prior attempts to regulate municipal storm sewers. He pointed out, for example, that "[r]unoff from municipal separate storm sewers and industrial sites contain significant values of both toxic and conventional pollutants," and that despite the Clean Water Act's "clear directive," the EPA "has failed to require most stormwater point sources to apply for permits which would control the pollutants in their discharge." (133 Cong. Rec. 1274, 1279–1280 (daily ed. Jan. 14, 1987).)

the EPA and the Ninth Circuit. In its final rule promulgated in the Federal Register, the EPA construed section 1342(p)(3)(B)(iii) as providing the administrative agency with the authority to impose water-quality standard controls in an NPDES permit if appropriate under the circumstances. Specifically, the EPA stated this statutory provision requires "controls to reduce the discharge of pollutants to the maximum extent practicable, *and where necessary water quality-based controls* . . . ." (55 Fed.Reg. 47990, 47994 (Nov. 16, 1990), italics added.) We are required to give substantial deference to this administrative interpretation, which occurred after an extensive notice and comment period. (See *ibid.*; *Chevron, supra,* 467 U.S. at pp. 842–844.)

The only other court that has interpreted the "such other provisions" language of section 1342(p)(3)(B)(iii) has reached a similar conclusion. (*Defenders of Wildlife, supra,* 191 F.3d at pp. 1166–1167.) In *Defenders of Wildlife,* environmental organizations brought an action against the EPA, challenging provisions in an NPDES permit requiring several Arizona localities to adhere to various best management practice controls without requiring numeric effluent limitations. (*Id.* at p. 1161.) The environmental organizations argued that section 1342(p) did not allow the EPA to issue NPDES permits without requiring strict compliance with effluent limitations. (*Defenders of Wildlife, supra,* at p. 1161.) Rejecting this argument, the Ninth Circuit found section 1342(p)(3)(B)(iii)'s statutory language "unambiguously demonstrates that Congress did not require municipal storm-sewer discharges to comply strictly" with effluent limitations. (*Defenders of Wildlife, supra,* at p. 1164.)

But in a separate part of the opinion, the *Defenders of Wildlife* court additionally rejected the reverse argument made by the affected municipalities (who were the interveners in the action) that "the EPA may not, under the [Clean Water Act], require strict compliance with state water-quality standards, through numerical limits or otherwise." (*Defenders of Wildlife, supra,* 191 F.3d at p. 1166.) The court stated: "Although Congress did not require municipal storm-sewer discharges to comply strictly with [numerical effluent limitations], § 1342(p)(3)(B)(iii) states that '[p]ermits for discharges from municipal storm sewers . . . shall require . . . *such other provisions as the Administrator . . . determines appropriate for the control of such pollutants.*' (Emphasis added.) That provision gives the EPA discretion to determine what pollution controls are appropriate. . . . [¶] *Under that discretionary provision, the EPA has the authority to determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants.* The EPA also has the authority to require less than strict compliance with state water-quality standards . . . . Under 33 U.S.C. § 1342(p)(3)(B)(iii), the EPA's choice to include either management practices or numeric limitations in the permits was within its discretion. [Citations.]" (*Defenders of Wildlife, supra,* 191 F.3d at pp. 1166–1167, second italics added.) Although dicta, this

conclusion reached by a federal court interpreting federal law is persuasive and is consistent with our independent analysis of the statutory language.[13]

To support its interpretation of section 1342(p)(3)(B)(iii), Building Industry additionally relies on the statutory provisions addressing nonpoint source runoff (a diffuse runoff not channeled through a particular source), which were also part of the 1987 amendments to the Clean Water Act. (§ 1329.) In particular, Building Industry cites to section 1329(a)(1)(C), which states, "The Governor of each State shall . . . prepare and submit to the [EPA] Administrator for approval, a report which . . . [¶] . . . [¶] describes the process . . . for identifying best management practices and measures to control each [identified] category . . . of nonpoint sources and . . . to reduce, to the *maximum extent practicable*, the level of pollution resulting from such category . . . ." (Italics added.) Building Industry argues that because this "nonpoint source" statutory language expressly identifies only the maximum extent practicable standard, we must necessarily conclude that Congress meant to similarly limit the storm sewer point source pollution regulations to the maximum extent practicable standard.

The logic underlying this analogy is flawed because the critical language in the two statutory provisions is different. In the nonpoint source statute, Congress chose to include only the maximum extent practicable standard (§ 1329(a)(1)(C)); whereas in the municipal storm sewer provisions, Congress elected to include the "and such other provisions" clause (§ 1342(p)(3)(B)(iii)). This difference leads to the reasonable inference that Congress had a different intent when it enacted the two statutory provisions. Moreover, because of a fundamental difference between point and nonpoint source pollution, Congress has historically treated the two types of pollution differently and has subjected each type to entirely different requirements. (See *Pronsolino v. Nastri* (9th Cir. 2002) 291 F.3d 1123, 1126–1127.) Given this different treatment, it would be improper to presume Congress intended to apply the same standard in both statutes. Building Industry's citation to comments during the 1987 congressional debates regarding nonpoint source regulation does not support Building Industry's contentions.

---

[13] Building Industry's reliance on two other Ninth Circuit decisions to support a contrary statutory interpretation is misplaced. (See *Natural Res. Def. Council, Inc. v. U.S.E.P.A., supra*, 966 F.2d at p. 1308; *Environmental Defense Center, Inc. v. U.S. E.P.A.* (9th Cir. 2003) 344 F.3d 832.) Neither of these decisions addressed the issue of the scope of a regulatory agency's authority to exceed the maximum extent practicable standard in issuing NPDES permits for municipal storm sewers.

### 4. *Contention that it is "Impossible" for Municipalities to Meet Water Quality Standards*

We also reject Building Industry's arguments woven throughout its appellate briefs, and emphasized during oral arguments, that the Water Quality Standards provisions violate federal law because compliance with those standards is "impossible." The argument is not factually or legally supported.

First, there is no showing on the record before us that the applicable water quality standards are unattainable. The trial court specifically concluded that Building Industry failed to make a factual showing to support this contention, and Building Industry does not present a proper appellate challenge to this finding sufficient to warrant our reexamining the evidence. All judgments and orders are presumed correct, and persons challenging them must affirmatively show reversible error. (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].) A party challenging the sufficiency of evidence to support a judgment must summarize (and cite to) *all* of the material evidence, not just the evidence favorable to his or her appellate positions. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887–888 [160 Cal.Rptr. 516, 603 P.2d 881]; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282 [188 Cal.Rptr. 123].) Building Industry has made no attempt to comply with this well-established appellate rule in its briefs.

In a supplemental brief, Building Industry attempted to overcome this deficiency by asserting that "[t]he record clearly establishes that [the Water Quality Standards provisions] are unattainable during the period the permit is in effect." This statement, however, is not supported by the proffered citation or by the evidence viewed in the light most favorable to the respondents. Further, the fact that many of the Municipalities' storm sewer discharges currently violate water quality standards does not mean that the Municipalities cannot comply with the standards during the five-year term of the Permit. Additionally, Building Industry's assertions at oral argument that the trial court never reached the impossibility issue and/or that respondents' counsel conceded the issue below are belied by the record, including the trial court's rejection of Building Industry's specific challenge to the proposed statement of decision on this very point.[14]

We reject Building Industry's related argument that it was respondents' burden to affirmatively show it is feasible to satisfy each of the applicable Water Quality Standards provisions. The party challenging the scope of an administrative permit, such as an NPDES, has the burden of

---

[14] Because we are not presented with a proper appellate challenge, we do not address the trial court's factual determinations in this case concerning whether it is possible or practical for a Municipality to achieve any specific Permit requirement.

showing the agency abused its discretion or its findings were unsupported by the facts. (See *Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 817; *Huntington Park Redevelopment Agency v. Duncan* (1983) 142 Cal.App.3d 17, 25 [190 Cal.Rptr. 744].) Thus, it was not respondents' burden to affirmatively demonstrate it was possible for the Municipalities to meet the Permit's requirements.

Building Industry alternatively contends it was not required to challenge the facts underlying the trial court's determination that the Permit requirements were feasible because the court's determination was wrong as a matter of law. Specifically, Building Industry asserts that a Permit requirement that is more stringent than a "maximum extent practicable" standard is, by definition, "not practicable" and therefore "technologically impossible" to achieve under any circumstances. Building Industry relies on a dictionary definition of "practicable," which provides that the word means " 'something that can be done; feasible,' " citing the 1996 version of "Webster's Encyclopedic Unabridged Dictionary."

██ This argument is unpersuasive. The federal maximum extent practicable standard is not defined in the Clean Water Act or applicable regulations, and thus the Regional Water Board properly included a detailed description of the term in the Permit's definitions section. (See *ante,* fn. 7.) As broadly defined in the Permit, the maximum extent practicable standard is a highly flexible concept that depends on balancing numerous factors, including the particular control's technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. This definition conveys that the Permit's maximum extent practicable standard is a term of art, and is not a phrase that can be interpreted solely by reference to its everyday or dictionary meaning. Further, the Permit's definitional section states that the maximum extent practicable standard "considers economics and is generally, but not necessarily, *less* stringent than BAT." (Italics added.) BAT is an acronym for "best available technology economically achievable," which is a technology-based standard for industrial storm water dischargers that focuses on reducing pollutants by treatment or by a combination of treatment and best management practices. (See *Texas Oil & Gas Ass'n v. U.S. E.P.A.* (5th Cir. 1998) 161 F.3d 923, 928.) If the maximum extent practicable standard is generally "less stringent" than another Clean Water Act standard that relies on available technologies, it would be unreasonable to conclude that anything more stringent than the maximum extent practicable standard is necessarily impossible. In other contexts, courts have similarly recognized that the word "practicable" does not necessarily mean the most that can possibly be done. (See *Nat. Wildlife Federation v. Norton* (E.D.Cal. 2004) 306 F.Supp.2d 920, 928, fn. 12 ["[w]hile the meaning of the term 'practicable' in the [Endangered Species Act] is not entirely clear, the term does not simply equate to 'possible' "]; *Primavera Familienstiftung v. Askin* (S.D.N.Y. 1998) 178 F.R.D.

405, 409 [noting that "impracticability does not mean impossibility, but rather difficulty or inconvenience"].)

We additionally question whether many of Building Industry's "impossibility" arguments are premature on the record before us. As we have explained, the record does not support that any required control is, or will be, impossible to implement. Further, the Permit allows the Regional Water Board to enforce water quality standards during the iterative process, but does not impose any obligation that the board do so. Thus, we cannot determine with any degree of certainty whether this obligation would ever be imposed, particularly if it later turns out that it is not possible for a Municipality to achieve that standard.

Finally, we comment on Building Industry's repeated warnings that if we affirm the judgment, all affected Municipalities will be in immediate violation of the Permit because they are not now complying with applicable water quality standards, subjecting them to immediate and substantial civil penalties, and leading to a potential "shut down" of public operations. These doomsday arguments are unsupported. The Permit makes clear that Municipalities are required to adhere to numerous specific controls (none of which are challenged in this case) and to comply with water quality standards through "timely implementation of control measures" by engaging in a cooperative iterative process where the Regional Water Board and Municipality work together to identify violations of water quality standards in a written report and then incorporate approved modified best management practices. Although the Permit allows the regulatory agencies to enforce the water quality standards during this process, the Water Boards have made clear in this litigation that they envision the ongoing iterative process as the centerpiece to achieving water quality standards. Moreover, the regulations provide an affected party reasonable time to comply with new permit requirements under certain circumstances. (See 40 C.F.R. § 122.47.) There is nothing in this record to show the Municipalities will be subject to immediate penalties for violation of water quality standards.

We likewise find speculative Building Industry's predictions that immediately after we affirm the judgment, citizens groups will race to the courthouse to file lawsuits against the Municipalities and seek penalties for violation of the Water Quality Standards provisions.[15] As noted, the applicable laws provide time for an affected entity to comply with new standards. Moreover, although we do not reach the enforcement issue in this case, we note the

[15] The Clean Water Act allows a citizen to sue a discharger to enforce limits contained in NPDES permits, but requires the citizen to notify the alleged violator, the state, and the EPA of its intention to sue at least 60 days before filing suit, and limits the enforcement to nondiscretionary agency acts. (See § 1365(a)(1)(2).)

Permit makes clear that the iterative process is to be used for violations of water quality standards, and gives the Regional Water Board the discretionary authority to enforce water quality standards during that process. Thus, it is not at all clear that a citizen would have standing to compel a municipality to comply with a water quality standard despite an ongoing iterative process. (See § 1365(a)(1)(2).)

## III.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Judgment affirmed. Appellants to pay respondents' costs on appeal.

Benke, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied January 4, 2005, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied March 30, 2005. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 866.