Filed 5/8/17  Certified for publication 5/31/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, | D070171 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2014-00038672-CU-WM-CTL) |
| CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Coast Law Group, Marco A. Gonzalez and Livia B. Beaudin for Plaintiff and Appellant.

Kathleen A. Kenealy, Acting Attorney General, Robert W. Byrne, Carol A. Squire, Deborah M. Fletcher and Josh Caplan, Deputy Attorneys General, for Defendant and Respondent.

This case concerns residual pollutant discharges from public fireworks displays over the waters of the United States within the jurisdiction of the California Regional Water Quality Control Board, San Diego Region (the Regional Board), which includes a large portion of San Diego County, portions of south Orange County, and the southwestern portion of Riverside County (San Diego Region). The Regional Board approved a National Pollutant Discharge Elimination System (NPDES) general permit for public displays of fireworks over the region's surface waters (the Fireworks Permit). Coastal Environmental Rights Foundation (CERF) appeals from the trial court's denial of its petition for writ of mandamus challenging the approval of the Fireworks Permit. CERF contends: (1) the trial court applied the wrong standard of review in denying its petition, (2) the Fireworks Permit violates federal law regarding water quality monitoring, and (3) the Fireworks Permit violates prohibitions in the State Water Resources Control Board's (the State Water Board) 2009 California Ocean Plan concerning discharges in areas of special biological significance (ASBS). We reject CERF's arguments and affirm the judgment.

BACKGROUND

Before setting forth the factual background of this particular case, it is helpful to summarize the statutory framework regulating water quality.

2

A.  Statutory Framework

In 1969, the California Legislature enacted the Porter-Cologne Water Quality Control Act (Porter-Cologne Act) to control water quality.  (Wat. Code,[1] § 13000.)  "The Porter-Cologne Act created the State Water Board to formulate statewide water quality policy and established nine regional boards to prepare water quality plans (known as basin plans) and issue permits governing the discharge of waste."  (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866, 875 (*Building Industry*).)  Under the Porter-Cologne Act, "[a] person discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state" must file a report with the appropriate regional board.  (§ 13260, subd. (a)(1).)  The regional board then prescribes waste discharge requirements, which must implement any applicable water quality control plans and take into consideration the beneficial uses to be protected.  (§ 13263, subd. (a).)

In 1972, the United States Congress substantially amended the Federal Water Pollution Control Act "by mandating compliance with various minimum technological effluent standards established by the federal government and creating a comprehensive regulatory scheme to implement these laws.  [Citation.]  The objective of this law, now commonly known as the Clean Water Act, was to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' "  (*Building Industry, supra*, 124 Cal.App.4th at p. 872.)  The Clean Water Act established a permitting system for

---

[1]     All further statutory references are to the Water Code unless otherwise indicated.

3

regulating discharges of pollutants into waters of the United States. (*Ibid.*) "The Clean Water Act employs the basic strategy of prohibiting pollutant emissions from 'point sources' unless the party discharging the pollutants obtains a permit, known as an NPDES permit." (*Ibid.*, fn. omitted.)

NPDES permits are issued by the United States Environmental Protection Agency or by a state that has an approved water quality program. (*Building Industry, supra*, 124 Cal.App.4th at p. 873.) California obtained the required approval to issue its own NPDES permits. (*Id.* at p. 875.) Thus, shortly after Congress enacted the Clean Water Act, the California Legislature amended the Porter-Cologne Act to authorize state issuance of NPDES permits. (*Ibid.*) Under the amended Porter-Cologne Act, regional water boards must "issue waste discharge requirements . . . which apply and ensure compliance with all applicable provisions [of the Clean Water Act], together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance." (§ 13377.)

Under federal regulations implementing the NPDES system of the Clean Water Act, each NPDES permit must include monitoring requirements. (40 C.F.R. §§ 122.1(a), 122.44(i).)[2] Specifically, "the Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit. 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) . . . . That is, an NPDES permit is

---

[2]    Unless otherwise stated, all references to the Code of Federal Regulations will be to the 2017 version.

4

unlawful if a permittee is not required to effectively monitor its permit compliance." (*Natural Resources Defense Council, Inc. v. County of Los Angeles* (9th Cir. 2013) 725 F.3d 1194, 1207.) All permits must specify "[r]equired monitoring including type, intervals, and frequency sufficient to yield data which are representative of the monitored activity, including, when appropriate, continuous monitoring." (40 C.F.R. § 122.48(b).) The permitting agency "has wide discretion and authority to determine monitoring requirements in NPDES permits." (*Natural Resources Defense Council, Inc. v. U.S. E.P.A.* (9th Cir. 1988) 863 F.2d 1420, 1434 (*NRDC v. EPA*).)

The State Water Board and the regional boards have the primary responsibility for the coordination and control of water quality. (§ 13001.) To meet this responsibility, the State Water Board adopted a water quality control plan for the ocean waters of the state, known as the California Ocean Plan. (§ 13170.2, subd. (a).) The California Ocean Plan protects "beneficial uses" of the ocean waters, including industrial water supply, recreation, navigation, fishing, mariculture, preservation and enhancement of areas designated as ASBS, rare and endangered species, marine habitat, fish migration, fish spawning, and shellfish harvesting. (California Ocean Plan, § I.A.) ASBS "are those areas designated by the State Water Board as ocean areas requiring protection of species or biological communities to the extent that alteration of natural water quality is undesirable." (California Ocean Plan, Appen. I.)

In general, waste should not be discharged in ASBS. "Discharges shall be located a sufficient distance from such designated areas to assure maintenance of natural water quality conditions in these areas." (California Ocean Plan, § E.1.) However, "Regional

5

Boards may approve waste discharge requirements or recommend certification for limited-term (i.e. weeks or months) activities in ASBS. Limited-term activities include, but are not limited to, activities such as maintenance/repair of existing boat facilities, restoration of sea walls, repair of existing storm water pipes, and replacement/repair of existing bridges. Limited-term activities may result in temporary and short-term changes in existing water quality. Water quality degradation shall be limited to the shortest possible time. The activities must not permanently degrade water quality or result in water quality lower than that necessary to protect existing uses, and all practical means of minimizing such degradation shall be implemented." (California Ocean Plan, § III.E.2.)

## B. The Fireworks Permit

Fireworks are pyrotechnic devices that produce noise, light, smoke, and floating materials. They can be grouped into general categories: (1) aerial shells (paper and cardboard spheres or cylinders filled with pyrotechnic materials), (2) low level comet and multishot devices, and (3) set piece displays mounted on the ground. Fireworks have various chemical constituents that burn at high temperatures when the firework is detonated. The chemical constituents separate from the firework's casing and internal shell components. A combustion residue is produced in the form of smoke, airborne particulates, chemical pollutants, and debris, including paper, cardboard, wires and fuses. The combustion residue and unignited pyrotechnic material, including duds and misfires, can fall into surface waters. The area impacted by fireworks residue can vary depending on wind speed and direction, size of the shells, the angle of the mortar placement, the type and height of fireworks explosions, and other environmental factors.

6

Before the Regional Board began considering the Fireworks Permit at issue in this case, discharges associated with fireworks in the San Diego Region were largely unregulated. At the time, only SeaWorld had obtained an individual fireworks discharge permit.[3] In May 2011, after issuing three drafts of the permit and considering public comments, the Regional Board adopted the Fireworks Permit. The Fireworks Permit applies to any person discharging pollutant waste from the public display of fireworks to surface waters in the San Diego Region. The Fireworks Permit includes various discharge prohibitions, including that "[t]he discharge of residual firework pollutant waste shall not cause, have a reasonable potential to cause, or contribute to exceedances of any applicable criterion promulgated by [the United States Environmental Protection Agency] pursuant to section 303 of the [Clean Water Act], or water quality objective adopted by the State Water Board or San Diego Regional Water Board."

The Fireworks Permit requires any fireworks discharger seeking coverage under the permit to file a notice of intent no later than 60 days before the fireworks event. The discharger must also submit a "Fireworks Best Management Practices Plan" to reduce pollutant discharges associated with the fireworks (Management Plan). The Management Plan must address the following elements: (1) use of alternative fireworks that burn cleaner and reduce pollutant waste in surface waters, (2) firing ranges designed to eliminate or reduce pollutant waste discharges to waters of the United States,

---

3     In contrast to an individual permit, the Fireworks Permits is a "general permit." General permits cover categories of discharges within a geographic area. (40 C.F.R. § 122.28(a)(1).)

(3) collection, removal, and management of particulate matter and debris from ignited and unignited pyrotechnic material no later than 24 hours following a public display of fireworks, (4) if the fireworks are launched from barges or floating platforms, the discharger must address related concerns, including set up, dismantling, and cleanup to minimize pollutant discharges to the waters, (5) management and disposal of hazardous fireworks waste immediately following public displays of fireworks, (6) collection and disposal of nonhazardous solid waste, (7) packaging, transportation, storage, setup, and handling of fireworks in a manner to prevent or minimize pollutant waste from entering surface waters, and (8) locating residual firework pollutant waste discharges a sufficient distance from ASBS.

The Fireworks Permit also addressed monitoring and reporting requirements for dischargers of fireworks. SeaWorld, a "Category 1" discharger, must perform receiving water and sediment monitoring and sampling. SeaWorld had conducted monitoring for sediment and water quality since 2001 in accordance with the terms of its individual NPDES permit. SeaWorld, unlike most other fireworks dischargers, conducts an average of 110 to 120 fireworks events per year. Those events occur in the same general location in Mission Bay. Thus, SeaWorld's fireworks likely represent the maximum firework pollutant loading conditions and cumulative effects on a surface water body.

Under the Fireworks Permit, "Category 2" dischargers, which include essentially all dischargers other than SeaWorld, are not required to perform the same monitoring and sampling as Category 1 dischargers. Instead, the Regional Board required Category 2 dischargers to conduct visual monitoring and submit a postevent report form detailing the

8

types of fireworks used and confirming that the surface waters were inspected and cleaned of pollutants within 24 hours following the fireworks display.

The Fireworks Permit also included special provisions for the continuation of two once per year fireworks shows in or near ASBS. These two fireworks shows are Independence Day fireworks events at Scripps Park in La Jolla and Heisler Park in Orange County. The La Jolla event has occurred approximately one quarter mile from the La Jolla ASBS since 1984. It is an event that runs 20 to 25 minutes and includes less than 500 pounds of pyrotechnic material discharged into the air over or adjacent to the La Jolla ASBS. The Heisler Park event runs approximately 15 minutes and includes 600 pounds of pyrotechnic material discharged over or adjacent to the Heisler Park ASBS. Approximately 20 to 46 percent of the Heisler Park firing range is over land.

The Regional Board determined the Independence Day public fireworks displays in or near the La Jolla ASBS and the Heisler Park ASBS are limited-term short duration activities that qualify for an exception to the general rule prohibiting discharges in ASBS. The Regional Board limited the La Jolla and Heisler Park approvals to single, annual Independence Day fireworks displays at each location with net explosive weight of fireworks under 1,000 pounds of pyrotechnic material. Further, the Regional Board required that the areal extent of the firing range in ASBS be limited to the maximum extent practicable to prevent or reduce residual firework pollutant waste discharges to ASBS. The Fireworks Permit also specifies that the residual pollutant waste discharges at the two locations cannot permanently alter natural water quality conditions in the

9

ASBS receiving waters. Temporary changes to natural ocean water quality conditions are permissible if beneficial uses are protected.

## C. Administrative and Superior Court Proceedings

After the Regional Board approved the Fireworks Permit, CERF appealed the approval to the State Water Board. The State Water Board did not take action on CERF's appeal for more than three years. In July 2014, CERF filed a petition for writ of mandate against the State Water Board challenging the State Water Board's failure to act on CERF's appeal. In October 2014, the State Water Board denied CERF's appeal.

In November 2014, CERF filed a petition for writ of mandate in the superior court challenging the Regional Board's approval of the Fireworks Permit. In its first amended petition, CERF alleged the Regional Board violated the Clean Water Act by failing to require monitoring of the type, interval, and frequency sufficient to yield data representative of the monitored activity and sufficient to assess dischargers' compliance with the Fireworks Permit. CERF also alleged the Regional Board violated the Water Code and the California Ocean Plan by approving discharges to the La Jolla ASBS and Heisler Park ASBS.

In its tentative decision, the trial court set forth its standard of review by stating: "Code of Civil Procedure section 1094.5 provides that a trial court reviewing the decision of an administrative agency must exercise its independent judgment in reviewing the evidence; and that an 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' [Citation.] 'Weight of the

10

evidence' is synonymous with 'preponderance.' [Citation.]" The trial court then went on to describe the substantial evidence standard of review.

At the hearing on the matter, the Regional Board sought to clarify the standard of review the court had utilized in making its ruling. The Regional Board pointed out that there was an inconsistency in the court's tentative ruling because the court set forth the independent review standard but then went on to discuss the substantial evidence standard. The Regional Board asked the court to confirm that it conducted an independent review of the matter. The trial court responded by stating, "I don't know how you could read this tentative ruling and not conclude that I independently reviewed the facts of this case." The court went on to state that it "drill[ed] down on this, read the record, . . . and [made its] own conclusions." The trial court pointed to a portion of the tentative ruling in which the court discussed the difference between once per year fireworks shows and SeaWorld's numerous shows that occur at the same location. The court stated, "Does that sound like somebody who is just taking the Regional Board's word for it. I think I went further than you."

After considering the administrative record and conducting an oral hearing, the trial court confirmed its tentative ruling as the final ruling of the court and denied the petition. The court found CERF had failed to meets it burden to establish the Regional Board abused its discretion by "rely[ing] on visual monitoring and detailed [best management practices] to demonstrate compliance with the permit's terms for all dischargers other than SeaWorld." The court concluded the Regional Board appropriately imposed different conditions and distinguished between annual event

11

fireworks dischargers and dischargers that conduct more frequent shows, such as those put on by SeaWorld up to 150 times per year over the same part of Mission Bay. The trial court stated that it "[chose] to defer to the far superior expertise of the [Regional Board] in matters relating to water quality." The court also found that CERF did not "carry its burden to demonstrate an abuse of discretion by the [Regional Board] in finding the 'Ocean Plan' exceptions applied to the limited Fourth of July shows at or near La Jolla Cove and Heisler Park." Lastly, as a separate and independent ground for denying the petition, the court determined the Water Code and Clean Water Act include an implied "Independence Day Exception" for Fourth of July fireworks shows.

DISCUSSION

I

*THE TRIAL COURT'S STANDARD OF REVIEW*

CERF argues the trial court applied an incorrect standard of review in considering CERF's challenge to the Regional Board's approval of the Fireworks Permit that did not require every permittee to conduct receiving water monitoring to assess compliance with the permit. We reject CERF's argument.

"A party aggrieved by a final decision or order of a regional board . . . may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate." (§ 13330, subd. (b).) The petition for writ of mandate is governed by Code of Civil Procedure section 1094.5, subdivision (c), and "the court shall exercise its independent judgment on the evidence." (§ 13330, subd. (e).) " 'In exercising its independent judgment, a trial court must afford a strong presumption

12

of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' " (*Building Industry, supra*, 124 Cal.App.4th at p. 879.) An "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c).)

The independent judgment standard in which the trial court determines whether administrative findings are supported by the weight of the evidence differs from the substantial evidence standard of review. (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435 (*Alberda*).) "In substantial evidence review, the reviewing court defers to the factual findings made below. It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial—or, as it is often put, whether any rational finder of fact could have made the finding that was made below. If so, the decision must stand." (*Ibid.;* italics omitted.) In contrast, under the independent judgment standard, "the trial court begins its review with a presumption that the administrative findings are correct, it does not defer to the fact finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance. [Citation.] The question is not whether any rational fact finder could make the finding

13

below, but whether the reviewing court believed the finding actually was correct." (*Ibid.*; italics omitted.)

"The question presented in this case—whether the trial court applied the correct standard of review—is a question of law. We review questions of law de novo." (*Alberda, supra*, 214 Cal.App.4th at p. 434.)

CERF argues the trial court improperly applied the substantial evidence standard of review and "deferred almost wholesale to the [Regional] Board's 'expertise' " on the permitting decision. CERF acknowledges that the trial court initially recited the correct independent judgment standard of review, but notes that the trial court went on to cite and discuss the substantial evidence standard. Relying on *Alberda, supra*, 214 Cal.App.4th at pages 433 through 436, and *Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1453-1455 (*Rodriguez*), CERF contends the trial court's references to the substantial evidence standard require reversal.

In *Alberda*, the petitioner filed a petition for writ of mandate to set aside respondent's denial of his application for a service connected disability retirement. (*Alberda, supra*, 214 Cal.App.4th at p. 428.) After the trial court denied the petition, petitioner appealed, arguing the trial court had applied an incorrect standard of review. (*Ibid.*) In that case, the trial court started its decision by stating the correct independent judgment standard of review. (*Id.* at p. 434.) However, the trial court went on to state that " 'substantial evidence supports the hearing officer's decision.' " (*Ibid.*) In discussing the merits of the case, the court continued to use the phrase "substantial evidence" numerous times and cited to authority applying the substantial evidence standard. (*Id.* at

14

pp. 434-435.) Based on the trial court's statement of the law coupled with its "statements throughout the statement of decision that 'substantial evidence supports' the hearing officer's decision or findings," the Court of Appeal concluded it was "likely the trial court applied the substantial evidence standard of review rather than the independent judgment standard." (*Id.* at p. 435.) Accordingly, the Court of Appeal remanded the matter to the trial court to reconsider under the independent judgment standard of review. (*Id.* at p. 436.)

Similarly, in *Rodriguez*, a police officer petitioned for writ of mandate after the city denied his application for industrial disability retirement. (*Rodriguez, supra*, 227 Cal.App.4th at p. 1445.) The trial court denied the petition. (*Ibid.*) On appeal, petitioner claimed the trial court applied an incorrect standard of review. (*Ibid*.) The trial court had referenced "sufficient evidence" once without citation to authority. (*Id.* at p. 1453.) However, "the statement of decision [left the Court of Appeal] with the distinct impression that the trial court likely did not apply the independent judgment standard in making its decision." (*Ibid.*) The Court of Appeal "reach[ed] that conclusion based on the fact that each time the court referenced the correct independent judgment standard, it also incorrectly stated that the [administrative law judge's] decision was entitled to 'deference.' " (*Ibid.*) Further, the trial court articulated no independent findings regarding petitioner's credibility, and instead, stated that sufficient evidence supported the administrative law judge's finding that petitioner lacked credibility. (*Id.* at p. 1454.)

Here, in contrast to *Alberda, supra,* 214 Cal.App.4th 426 and *Rodriguez, supra,* 227 Cal.App.4th 1446, the trial court's order does not demonstrate that it applied an

15

incorrect standard of review. The trial court initially set forth the correct independent judgment standard. Although the trial court later set forth the "substantial evidence" standard and stated that it chose "to defer to the far superior expertise of the [Regional Board] in matters relating to water quality," it is clear that the trial court independently reviewed and weighed the evidence. For example, the trial court considered the evidence regarding the differences in scale, frequency, and location of SeaWorld's numerous fireworks shows as compared to other fireworks dischargers. Based on the distinctions, the trial court found the Regional Board properly exercised its discretion to distinguish between SeaWorld and other dischargers and varied permit conditions accordingly. Moreover, unlike *Alberda* and *Rodriguez*, the trial court clarified during the hearing on the matter that it independently reviewed the facts, made its own conclusions, and did not "just [take] the Regional Board's word for it." Reading the record and trial court's order as a whole, the trial court's decision is distinctly different from that of the trial courts in *Alberda* and *Rodriguez*. Unlike those cases, the trial court's decision here reflected that the court applied the independent judgment standard, which the court confirmed at the oral proceedings.

We also reject CERF's argument that the record reflects the trial court did not independently and fully examine CERF's petition. CERF contends the trial court did not recognize that CERF alleged two causes of action, one concerning monitoring of *all* fireworks discharges within the Regional Board's jurisdiction and the other concerning two particular shows (La Jolla and Heisler Park) in or near ASBS. While the court stated that CERF's petition focused on the La Jolla and Heisler Park shows, it also discussed

16

other shows within the San Diego Region. Further, both parties informed the court that CERF was challenging the Fireworks Permit because it did not require receiving water monitoring for all permittees. After considering the evidence and the parties' arguments, the trial court concluded that the Regional Board did not abuse its discretion in drawing a distinction between SeaWorld's frequent shows and other dischargers. The trial court specifically concluded CERF failed to carry its burden to demonstrate the Regional Board abused its discretion "to rely on visual monitoring and detailed [best management practices] to demonstrate compliance with the permit's terms for *all dischargers* other than SeaWorld." Accordingly, the trial court considered and ruled on the Fireworks Permit as it relates to all shows in the San Diego Region.

II

*MONITORING REQUIREMENTS*

CERF argues that had the trial court applied the independent judgment standard, it would have concluded the Fireworks Permit does not comply with the Clean Water Act's monitoring requirements. Specifically, CERF contends the Fireworks Permit violates the Clean Water Act because it lacks monitoring sufficient to assure compliance with the permit's terms; the Regional Board had no reasonable basis to conclude the Fireworks Permit's best management practices will adequately control and abate the discharge of residual pollutant waste from public fireworks events because data from SeaWorld's monitoring of receiving waters showed exceedances of water quality standards despite implementation of best management practices; although the Regional Board concluded large fireworks events resulted in levels of pollutants above water and sediment quality

17

objectives, it failed to require monitoring for all large events and intermediate events for which it had no data; and the Fireworks Permit's monitoring and reporting program fails to fulfill its purpose of preventing exceedances in both San Diego Bay and Mission Bay.

Having found that the trial court applied the appropriate independent judgment standard, we review its factual determinations under the substantial evidence standard and its legal determinations under the de novo standard. (*Building Industry, supra*, 124 Cal.App.4th at p. 879; *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.) "[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." (*Building Industry, supra,* at p. 879.)

## A. Clean Water Act's Monitoring Requirements

Under federal regulations implementing the Clean Water Act, NPDES permits must have monitoring requirements "to assure compliance with permit limitations." (40 C.F.R. § 122.44(i)(1).) All permits must specify "[r]equired monitoring including type, intervals, and frequency sufficient to yield data which are representative of the monitored activity including, when appropriate, continuous monitoring." (40 C.F.R. § 122.48(b).)

As the permitting agency, the Regional Board has wide discretion to determine monitoring requirements. (See *NRDC v. EPA, supra*, 863 F.2d at p. 1434; *Webb v. Gorsuch* (1983) 699 F.2d. 157, 161.)

18

The Clean Water Act does not specify particular monitoring methods. In *NRDC v. EPA*, the Ninth Circuit Court of Appeals considered a challenge to the EPA's approval of a NPDES permit relating to the discharge of pollutants from oil and gas operations in the Gulf of Mexico. (*NRDC v. EPA, supra*, 863 F.2d at p. 1424.) The permit "prohibit[ed] the discharge of drill cuttings generated during the use of oil-based muds because the oil within the cuttings are conventional pollutants." (*Id.* at p. 1433.) The petitioners "object[ed] to the use of a visual sheen test as a method of monitoring compliance with the prohibition on the discharge of free oil." (*Ibid*.) The visual sheen test is " 'a visual observation of the receiving water' after drilling fluids are discharged, to determine if a sheen results on the surface of the water." (*Ibid.*) The Ninth Circuit upheld the visual monitoring method because it was a " 'generally valid and useful standard' in other contexts" and the Environmental Protection Agency "has wide discretion and authority to determine monitoring requirements in NPDES permits." (*Id.* at pp. 1433-1434; see also *Webb v. Gorsuch, supra*, 699 F.2d at p. 161 ["EPA's failure to require biological monitoring was not arbitrary or capricious since the Clean Water Act gives EPA discretion to require such monitoring."].)

Here, CERF objects to the use of visual monitoring to assess compliance with the Fireworks Permit. CERF contends that in order to comply with the Clean Water Act, the Fireworks Permit was required to mandate receiving water monitoring for all dischargers, such as the requirements imposed on SeaWorld, to assess whether fireworks discharges resulted in exceedances of water quality standards. The Regional Board determined that proper implementation of the best management practices set forth in the Fireworks

19

Permit, including visual monitoring, would adequately control and abate the discharge of pollutant wastes from fireworks events over the region's surface waters.

In reaching its conclusion, the Regional Board considered various factors, including existing data from SeaWorld's monitoring, which showed that it was unlikely that any single fireworks event smaller than SeaWorld's major Fourth of July and Labor Day events would causes exceedances in water quality criteria. The Regional Board recognized, however, that the continuous discharge of fireworks from large events and cumulative discharges from smaller events could result in pollutant accumulation. The Regional Board also considered that "[t]he receiving water fallout area affected by the fireworks residue can vary depending on wind speed and direction, size of the shells, the angle of mortar placement, the type and height of firework explosions and other environmental factors." Further, wide dispersion of firework constituents from wind, tidal effects, and other factors, along with pollution from other sources, make detection of residual firework pollutant waste difficult.

CERF has not pointed to any authority, and we have found none, suggesting that visual monitoring is an invalid monitoring method under the Clean Water Act. To the contrary, relevant authority indicates that the permitting agency has wide discretion in developing and imposing monitoring requirements and can rely on visual monitoring in appropriate contexts. (See *NRDC v. EPA, supra*, 863 F.2d. at pp. 1433-1434.) Based on the Regional Board's wide discretion, the data before it, and the various factors impacting the dispersion and detection of residual fireworks pollutants, we conclude the Regional Board acted reasonably in deciding to rely on best management practices and visual

20

monitoring as a method for assessing compliance with the Fireworks Permit. CERF has failed to show that the Regional Board's decision to rely on visual monitoring and best management practices was legally or factually unsupported.

## B. Best Management Practices

CERF contends the Regional Board had no reasonable basis to conclude the Fireworks Permit's best management practices will adequately control and abate the discharge of residual pollutant waste from public fireworks events. Specifically, CERF argues the only available data, which was from SeaWorld's monitoring of receiving waters under SeaWorld's individual NPDES permit, showed exceedances of water quality standards despite implementation of best management practices. We reject CERF's arguments.

Under the terms of its individual NPDES permit, SeaWorld was subject to best management practices. SeaWorld's practices included sweeping the fireworks discharge zone, gathering floating debris using hand held fishnets, sweeping the surface of the fireworks barge immediately after shows to prevent solid waste and debris from being swept into the water by wind, collecting, handling and disposing of unexploded fireworks, and picking up fireworks debris on the nearby shoreline every morning following each aerial fireworks display.

SeaWorld has monitored the potential effects of its fireworks displays on both water and sediments in Mission Bay since 2001 and conducted a detailed analysis in 2006. SeaWorld conducted water chemistry sampling of both its regular events, which typically involve detonation of 200 pounds of net explosive weight, and its larger Fourth

21

of July and Labor Day events, which involve approximately 1,000 pounds of net explosive weight per event. In considering the Fireworks Permit at issue in this case, the Regional Board reviewed and considered SeaWorld's data.

SeaWorld's regular events showed little evidence of pollutants within the receiving water column at levels above applicable water quality criteria. SeaWorld's water chemistry sampling after its larger Fourth of July and Labor Day fireworks events showed receiving waters in the fallout area exceeded both water quality criteria and levels documented at reference sites. "Pollutants such as arsenic, copper, mercury, tin, zinc and phosphorous were detected at levels above water quality criteria or at elevated levels compared to the reference sites. However, only phosphorous exceeded instantaneous water quality criteria." The Regional Board concluded, based on the data before it, that it is unlikely any single fireworks event smaller than SeaWorld's Fourth of July and Labor Day events would cause exceedances of applicable water quality criteria, but cumulative discharges may cause pollutant accumulation in bay sediments.

There is no indication in the record that any exceedances in the water quality criteria resulted from ineffective best management practices. While SeaWorld was subject to best management practices under its individual NPDES permit, water chemistry sampling of SeaWorld's regular events showed little evidence of pollutants within receiving waters above applicable water quality criteria. Following large events, only one element exceeded instantaneous water quality criteria. Although there were elevated levels of pollutants within the fireworks fallout area relative to reference sites, the elevated levels were primarily after large events and below applicable water quality

22

criteria. Further, the evidence before the Regional Board showed that other factors, such as the frequency, location, and unique characteristics of SeaWorld's events, may have impacted water quality.

Unlike typical single event dischargers, SeaWorld conducts up to 150 fireworks events per year in the same general location from a barge in Mission Bay. SeaWorld has put on more than 3,500 fireworks shows since 1985. Mission Bay is unique due to the restricted circulation of waters within the bay and the shallow depth of the bay in the vicinity of the fireworks events. As a result of these factors, the Regional Board determined SeaWorld's events represent the maximum firework pollutant loading conditions and cumulative effects on a surface water body. This conclusion was supported by the evidence.

Additionally, as the Regional Board notes, the best management practices required under SeaWorld's individual NPDES permit are not identical to those contained in the Fireworks Permit at issue here. In addition to requiring fireworks dischargers to sweep debris following events, permittees under the Fireworks Permit must consider use of alternative fireworks and firing ranges to reduce pollutant waste in surface waters and management and handling of the fireworks in a manner that minimizes the risk of pollutant waste from entering surface waters.

Contrary to CERF's argument, the evidence supported the Regional Board's decision to treat SeaWorld differently from other fireworks dischargers in the region. SeaWorld's fireworks events present exceptional and maximum pollutant circumstances because of the combined impact of their frequency, location in a shallow portion of the

23

bay, and restricted water circulation in the area. Even with these combined factors, SeaWorld's regular events showed little evidence of pollutants above applicable water quality criteria. Based on the evidence before the Regional Board concerning water quality sampling and the difficulty in monitoring firework pollutant waste because of the wide dispersion of firework constituents from wind, tidal effects, and other factors, along with pollution from other sources, the Regional Board appropriately declined to require all dischargers to conduct receiving water monitoring.

C. Requirements Imposed on Other Large and Intermediate Level Shows

CERF argues that although the Regional Board concluded large fireworks events resulted in levels of pollutants above water and sediment quality objectives, it failed to require monitoring for all large events and intermediate events for which it had no data. In particular, CERF contends the Regional Board should have required receiving water monitoring for intermediate level shows, such as those conducted in La Jolla and Heisler Park, because they exceeded the 200-pound threshold of SeaWorld's regular shows and the Regional Board did not have any data to presume the intermediate level shows would not negatively impact water quality. Pointing to the Big Bay Boom fireworks show in San Diego Bay, CERF further contends that the Regional Board should have required receiving water monitoring for all large fireworks shows other than SeaWorld's events.

CERF's arguments are not persuasive. The shows that CERF points to are limited events that take place once per year on the Fourth of July. The La Jolla and Heisler Park shows each involve 600 pounds or less of net explosive weight. Further, 20 to 46 percent of the Heisler Park show occurs over land.

24

Although water chemistry sampling after SeaWorld's large fireworks events, which involved 1,000 pounds of net explosive weight, showed the receiving waters exceeded water quality criteria and levels documented at reference sites, SeaWorld's events had numerous unique factors that may have contributed to the results. For example, SeaWorld conducted frequent shows in the same shallow location of Mission Bay with restricted water circulation. CERF does not point to evidence that the Heisler Park and La Jolla events had the same or similar characteristics to the location and frequency of SeaWorld's events. Additionally, the water chemistry sampling showed only one element exceeded instantaneous water quality criteria after large events. SeaWorld's regular events involving 200 pounds of net explosive weight did not result in pollutants within the receiving water column at levels above applicable water quality criteria. The evidence before the Regional Board supported its conclusion that "it is unlikely that single fireworks events of a smaller size than SeaWorld's Fourth of July and Labor Day events would cause exceedances of applicable water quality criteria in the water column of receiving waters." Accordingly, the Regional Board reasonably did not subject intermediate level shows to receiving water monitoring.

Similarly, CERF's argument concerning the Big Bay Boom lacks merit. The Big Bay Boom is a Fourth of July fireworks event in San Diego Bay. It involves fireworks discharged from four barges that are more than one mile apart. CERF contends the Big Bay Boom involves 18,040 shells, making the fireworks discharged from each barge an event comparable to or exceeding SeaWorld's large Fourth of July and Labor Day events. However, at the hearing on the Fireworks Permit before the Regional Board, the producer

25

of the Big Bay Boom stated that each barge involves approximately 850 pounds of fireworks. Thus, the Big Bay Boom is not similar to SeaWorld's Fourth of July and Labor Day events because the Big Bay Boom involves discharges from multiple barges spread out in San Diego Bay and each barge is under the 1,000 pounds discharged at SeaWorld's large events.

D. Monitoring and Reporting Program's Purpose

CERF argues the Fireworks Permit's monitoring and reporting program does not fulfill its purpose to prevent exceedances of the receiving water and sediment quality limitations in the permit for discharges in both San Diego Bay and Mission Bay. CERF's argument focuses on the lack of monitoring required for shows in San Diego Bay, such as the Big Bay Boom. Specifically, CERF contends that because of the various factors affecting a firework event's impact to receiving water, such as frequency of events, amount of fireworks per event, perchlorate oxidation, wind direction and velocity, SeaWorld's data could not be extrapolated to San Diego Bay.

As we previously explained, the Big Bay Boom in San Diego Bay is easily distinguishable from SeaWorld's fireworks events based on the frequency of SeaWorld's events and location in Mission Bay with unique characteristics. CERF does not point to any evidence to suggest that annual or limited fireworks events in San Diego Bay that do not reach the 1,000 pounds of net explosives of SeaWorld's large events would impact water or sediment quality to a degree that requires the same level of monitoring imposed on SeaWorld. Instead, the evidence before the Regional Board supports its conclusion

26

that single fireworks events smaller than SeaWorld's Fourth of July and Labor Day events would not cause exceedances of applicable water quality criteria.

III

*LA JOLLA AND HEISLER PARK ASBS*

CERF argues the Regional Board's approval of discharges into the La Jolla and Heisler Park ASBS violates prohibitions in the California Ocean Plan. Specifically, CERF contends the California Ocean Plan generally prohibits discharges to ASBS and, under the doctrine of *ejusdem generis*, the exception for limited-term activities does not apply to fireworks events. CERF further contends the Regional Board failed to meet the terms of the exception and the Fireworks Permit's best management practices. CERF's arguments are unavailing.

The California Ocean Plan prohibits waste discharges to ASBS. (California Ocean Plan, § III.E.1.) "Discharges shall be located a sufficient distance from such designated areas to assure maintenance of natural water quality conditions in these areas." (California Ocean Plan, § III.E.1.) However, the California Ocean Plan contains an exception for limited-term activities in ASBS. "Limited-term activities include, but are not limited to, activities such as maintenance/repair of existing boat facilities, restoration of sea walls, repair of existing storm water pipes, and replacement/repair of existing bridges. Limited-term activities may result in temporary and short-term changes in existing water quality. Water quality degradation shall be limited to the shortest possible time. The activities must not permanently degrade water quality or result in water quality

27

lower than that necessary to protect existing uses, and all practical means of minimizing such degradation shall be implemented."  (California Ocean Plan, §III.E.2.)

The Regional Board utilized the "limited-term" exception to approve the annual Fourth of July public fireworks displays near the La Jolla ASBS and in the Heisler Park ASBS.  The La Jolla event is a 20 to 25 minute show that takes place approximately one quarter mile from the La Jolla ASBS, but its fireworks fallout area may extend into portions of the ASBS.  The Heisler Park event is a 15 minute show that takes place over or adjacent to the Heisler Park ASBS, with 20 to 46 percent of the firing range over land.

Relying on the principle of *ejusdem generis*, CERF contends the State Water Board intended to limit the exception for discharges in ASBS to infrastructure projects or other activities similar to maintenance/repair of existing boat facilities, restoration of sea walls, repair of existing storm water pipes, and replacement/repair of existing bridges. "The principle of *ejusdem generis* instructs that 'when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope.  [Citations.]'  [Citations.]  '*Ejusdem generis* applies whether specific words follow general words in a statute or vice versa.  In either event, the general term or category is "restricted to those things that are similar to those which are enumerated specifically." ' "  (*Pour Le Bebe, Inc. v. Guess? Inc*. (2003) 112 Cal.App.4th 810, 826-827.)

In *Kraus v. Trinity Management Services, Inc*. (2000) 23 Cal.4th 116, 141 (*Kraus*), our high court considered whether a nonrefundable security and administrative fee was a

28

"security" as defined by Civil Code section 1950.5. That statute defined "security" as "any payment, fee, deposit, or charge, including, but not limited to, any of the following: [four examples]." (*Kraus, supra,* at p. 139.) All four examples set forth in the definition of "security" were "charges intended to secure the landlord against future tenant defaults." (*Id.* at p. 141.) Applying the principle of *ejusdem generis* and reading the statute as a whole, the court concluded that "even though a security is not limited to the examples set out in [the statute], a security is limited to charges imposed to secure the landlord against future tenant defaults." (*Ibid.*)

Here, the "limited-term" exception in the California Ocean Plan provided examples of "limited-term activities," including, but not limited to, "activities such as maintenance/repair of existing boat facilities, restoration of sea walls, repair of existing storm water pipes, and replacement/repair of existing bridges." (California Ocean Plan, § III.E.2.) First, the plain language of the exception provides that it is not limited to the particular activities set forth therein. Instead, the delineated activities are merely examples. Further, unlike *Kraus, supra,* 23 Cal.4th 116, in addition to providing examples of "limited-term activities," the provision in this case sets forth various criteria for the exception to apply. For example, the activity must be for a limited-term (i.e., not more than weeks or months), water quality degradation must be for the shortest time possible, the activity must not permanently degrade water quality, and all practical means of minimizing such degradation shall be implemented. (California Ocean Plan, § III.E.2.) Reading the limited-term exception as a whole, we conclude it is not limited to short-term necessary infrastructure projects as CERF suggests. Rather, in order for the Regional

Board to apply the exception, it must determine whether the activity meets the criteria for the exception to apply.

We also reject CERF's argument that the Regional Board's application of the limited-term exception to annual Fourth of July fireworks displays in or near the La Jolla ASBS and Heisler Park ASBS conflicts with the California Ocean Plan and the Fireworks Permit's best management practices. In particular, CERF contends that, contrary to the California Ocean Plan and Firework Permit's best management practices, the Regional Board made no effort to ensure that the La Jolla and Heisler Park dischargers located the events a sufficient distance from areas designated as ASBS, designed firing ranges to eliminate or reduce residual pollutant waste discharges to waters of the United States, limited the aerial extent of the firing range in the ASBS to the maximum extent practicable, limited water degradation to the shortest possible time, and implemented all practical means to minimize water degradation.

CERF fails to acknowledge that the Fireworks Permit specifically subjects the La Jolla and Heisler Park events to the best management practices imposed on all dischargers and special conditions to comply with the California Ocean Plan. Further, the Regional Board exercised its discretion to approve the events under the limited-term activity exception in the California Ocean Plan. The activities comply with the requirements of the exception because they occur only once per year, the shows would not permanently degrade water quality and the events are subject to proper implementation of best management practices in order to minimize residual firework pollutant waste discharges to ASBS.

30

Based on the foregoing, we conclude CERF failed to show the Regional Board's application of the limited-term activity exception to the Fourth of July events at or near the La Jolla ASBS and Heisler Park ASBS was legally or factually unsupported.

Lastly, we need not reach CERF's argument that the trial court erred in finding an implied "Independence Day Exception" in the Water Code and Clean Water Act. "A judgment correct on any legal basis need not be overturned because the court relied on an allegedly erroneous reason." (*Waldsmith v. State Farm Fire & Casualty, Co*. (1991) 232 Cal.App.3d 693, 698, citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

## DISPOSITION

The judgment is affirmed. Respondent is entitled to costs on appeal.


_____

HUFFMAN, Acting P. J.

WE CONCUR:


_____

NARES, J.


_____

HALLER, J.

31

Filed 5/31/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, | D070171 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2014-00038672-CU-WM-CTL) |
| CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, | |
| Defendant and Respondent. | |

THE COURT:

The opinion filed May 8, 2017, is ordered certified for publication.

HUFFMAN, Acting P. J.

Copies to:  All parties